**UNITED ELECTRICAL, RADIO & MA-
CHINE WORKERS OF AMERICA
(UE), LOCAL 1113, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 12114.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 4, 1955.

Decided May 26, 1955.

Mr. Basil R. Pollitt, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Joseph Forer, Washington, D. C., was on the brief, for petitioner.

Miss Fannie M. Boyls, Atty., National Labor Relations Board, of the bar of the Supreme Court of Texas, pro hac vice, by special leave of Court, with whom Mr.

Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, was on the brief, for respondent. Mr. A. Norman Somers, Asst. Gen. Counsel, National Labor Relations Board, and Mr. Robert G. Johnson, Atty., National Labor Relations Board, also entered appearances for respondent.

Messrs. Arthur J. Goldberg and David E. Feller, Washington, D. C., filed a brief on behalf of Congress of Industrial Organizations, as amicus curiae.

Before PRETTYMAN, DANAHER and BASTIAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

United Electrical, Radio and Machine Workers of America, Local 1113, which we shall call UE, filed with the National Labor Relations Board charges against the Marathon Electric Manufacturing Corporation, which we shall call the Company, alleging violations of several subparagraphs of Section 8 of the National Labor Relations Act as amended.[1] The Board found in favor of the Union in some respects, not now involved, and found that a preponderance of the evidence did not sustain the charges in other respects. These latter portions of the findings and order are the subject matter of the present petition.

UE had been the recognized bargaining representative of the Company's employees for more than fifteen years prior to 1952. The last contract entered into by it with the Company was effective July 31, 1951, for a one-year term. The contract contained, *inter alia*, a union-shop clause, a grievance and arbitration clause, and a no-strike, no-lockout clause. The latter provided in part that "In view of the orderly procedure outlined in this agreement, the Union will not authorize or sanction any strike, stoppage, slowdown, or restriction of out-put * * *. In case [of] any such action * * * any or all of the employees taking part will be subject to discipline or discharge."

A dispute over a general wage increase occurred. In the midst of it, on February 28, 1952, UE officers and stewards called a meeting of the full membership of the Union for two o'clock that afternoon. They notified all employees at work and made several announcements over the local radio station. Sharply at two o'clock all of the 446 employees in the plant, except one watchman, stopped work, walked out, and with few exceptions went to the meeting. No prior strike notice had been given the Federal Mediation and Conciliation Service, and the only basis in the record for a claim of notice to the Company is in a telephone conversation between a Union officer and a Company officer one hour before the walkout. The plant employees were given no indication by the Union officers and stewards as to how long the walkout would last or when they would return to work. Neither was the Company given any such information. About thirty minutes after the walkout the manager of the plant directed that the various gates be closed and locked. Some twenty out of forty-nine second-shift employees, due to start work at three o'clock, appeared in the vicinity of the plant. They were advised by their stewards of the Union meeting then in progress. Practically all of those who had come to the plant went on to the meeting. The meeting was occupied with discussion of various features of a strike. At about three o'clock a steward arrived, asked for a point of order, was immediately recognized, and announced, "The gates are now officially locked." After this announcement and some further discussion the chairman directed the employees to report for work at their regular times and to continue to report until told otherwise.

The next day, February 29th, the Company sent to every employee on its current payroll a letter, which stated in part:

"Since the action taken by the Union and its members Thursday afternoon was the second such violation resulting from irresponsible leadership, the Company has no alternative

---

1. 61 Stat. 136 (1947), 29 U.S.C.A. § 151 et seq.

but to consider that all participants have forfeited any rights as employees and are accordingly being removed from the Company payroll." [2]

The following Monday, March 3rd, the Company advertised by newspaper and radio for employees, and on March 5th sent another letter to all employees (except Union officials) who had been on its payroll, urging them to reenter Company employ. That same day the Company sent UE a letter saying in part:

"We hereby notify you that because of the breach of our contract with you dated July 31, 1951, we hereby cancel the contract.

"All employees who have taken part in the strike are discharged under Article XII section 3 of the contract.

"Therefore, you no longer represent a majority of our employees and we cannot continue to recognize you as a Bargaining agent for our employees."

Beginning March 27th a series of demands for bargaining were made upon the Company by UE. The Company did not respond to these requests.

### I

UE says the Company violated the Act by terminating the contract. The Board found the walkout was a breach of the contract [3] and concluded that the subsequent cancellation by the Company

was justified and not a violation of the statute. Of course, if the breach *ipso facto* terminated the contract, UE has no support for its contention respecting termination by the Company. But in order to consider the contention we will assume *arguendo* that the breach by UE was not in itself a complete termination of the contract; that is, we will assume that after the breach the Company elected to rescind and thereupon formally terminated the agreement.

It is general law that one party to a contract need not perform if the other party refuses in a material respect to do so.[4] And that rule applies to labor contracts.[5] Moreover, in cases where the breach is a strike in violation of a collective bargaining agreement, as in the instant case, application of the rule is supported by the rationale underlying such agreements. The prevention of strikes is one of the principal purposes of labor contracts and of the Act.[6] A no-strike provision is "The chief advantage which an employer can reasonably expect from a collective labor agreement".[7] The walkout was a material breach which justified the subsequent rescission of the contract by the Company.

UE makes an argument that the Company's termination of the contract was illegal because contrary to the provisions of Sections 8(a) (5) and 8(d) of the Act. Section 8(a) (5) says that it shall be an unfair labor practice for an employer to refuse to bargain collectively

---

2. The expression "second such violation" was a reference to a strike called by UE in July, 1946, which lasted five or six weeks.

3. In its Decision and Order the Board stated, "The Trial Examiner found, and the General Counsel concedes, that the * * * walkout was unprotected [by the Act] because it was in breach of the contract". In the present appeal UE makes no argument to the contrary. We agree with that finding.

4. 5 Williston, Contracts §§ 1455, 1467 (Rev. ed. 1947); Restatement, Contracts § 397 (1932).

5. Boeing Airplane Co. v. Aeronautical Industrial District Lodge No. 751, International Ass'n of Machinists, 9 Cir., 1951, 188 F.2d 356, certiorari denied, 1951, 342 U.S. 821, 72 S.Ct. 39, 96 L.Ed. 621; United Biscuit Co. v. National Labor Relations Board, 7 Cir., 1942, 128 F.2d 771, 775; Boeing Airplane Co. v. National Labor Relations Bd., D.C.Cir., 1949, 85 U.S. App.D.C. 116, 174 F.2d 988.

6. S.Rep.No. 105, 80th Cong., 1st Sess. 15–16 (1947); Sec. 1, National Labor Relations Act, 49 Stat. 449 (1935), as amended, 61 Stat. 136 (1947), 29 U.S.C.A. § 151.

7. S.Rep.No. 105, 80th Cong., 1st Sess. 16 (1947).

with the representatives of his employees. Section 8(d) is the section which defines collective bargaining, and it further provides, *inter alia*, that a collective bargaining agreement shall not be terminated unless the party desiring such termination (1) gives the other party to the contract sixty days prior notice, (2) gives the Federal Mediation Service thirty days prior notice, (3) offers to confer with the other party for the purpose of negotiating a new contract, and (4) continues the contract in full force and effect without resorting to strike or lockout for sixty days after the notice to the other party. The major premise of UE's argument is that "The Employer's action purporting to terminate the agreement was a refusal to bargain under the Act." But UE itself had violated Section 8(d) and so had refused to bargain collectively. The Section provides that "the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless. the party desiring such termination or modification" meets the conditions of the Section.

A binding contract was in existence. UE, not the Company, was desiring modification of the existing contract. The contract provided for a wage increase of five cents an hour. There was a further provision for an additional increase of four cents an hour "if permitted by government policy". An increase of seven cents an hour was put into effect by the Company. A joint petition was filed with the Wage Stabilization Board, seeking approval of the remaining two-cent increase. That petition was withdrawn by UE prior to decision by that Board. Thereafter UE took the position that the remaining two cents should be put into effect in the form of fringe benefits. In taking that position UE sought to modify the existing contract. In attempting

thus to modify the contract by its demands upon the Company, UE was required to comply with the Section. It complied with none of the provisions of the Section. By not complying it was refusing to bargain collectively within the definition of the Section. This refusal occurred before the alleged refusal of the Company. As we shall see in a moment, under further provisions of Section 8(d) the employees who engaged in the strike without complying with the sixty-day notice requirement lost their status as employees. Under the foregoing conditions it seems clear that the employer was not required to comply with the provisions of Section 8(d). To hold otherwise would mean that one party could flatly refuse to comply with these provisions but at the same time demand for himself all the benefits of the Section.

## II

The next point concerns the discharge of employees consequent to the strike. The point divides itself into two questions: (1) Did the Company violate the Act when it discharged the strike participants? [8] (2) Did the Company discharge non-participants and thereby violate the Act?

■ 1. UE urges that the employees who participated in the strike were discharged because of their Union membership and therefore the Company violated Sections 8(a) (1) and 8(a) (3) of the statute. It concedes that, had the Company discharged these employees because of their participation in the breach of the contract, the discharges would not have been in violation of the statute.[9] But it contends the discharges were part and parcel of the Company's prior decision to abandon the contract and were not predicated upon the strike. The evidence does not support the contention. Moreover Section 8(d) of the Act specif-

8. There was no issue before the Board respecting the discharges of the first-shift employees, who actually walked off the job to attend the meeting of the Union. We are therefore concerned only with those employees who can properly

be classed as participants in the strike even though not among those who in fact walked off the job.

9. See National Labor Relations Board v. Sands Mfg. Co., 1939, 306 U.S. 332, 344, 59 S.Ct. 508, 83 L.Ed. 682.

ically provides that "Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee". This strike was within the sixty-day period, and so the participants immediately thereupon lost their status as employees. Section 8(a) (1) refers to "employees", that is, to persons with "status" as employees. Having lost such status the participants were no longer protected by that Section.

Section 8(a) (3) makes it an unfair labor practice for an employer to discourage membership in a union by discriminating in respect to hire or tenure of employment. It makes no express requirement that the discrimination be directed to employees, and the Supreme Court has held [10] the prohibition to apply to applicants for employment. But this case does not concern hire or tenure; it concerns discharges. The position of UE on the point is not clear, but it seems to rest upon the same premise as does its argument in respect to Section 8(a) (1), supra, and here again the evidence fails to support the contention. The Board's conclusion in respect to it seems to us well grounded in the record.

■ 2. The Company's notices of discharge were addressed to "participants" in the strike. Disputes arose before the Board as to whether certain employees, not present at the plant at the time the strike was initiated, were or were not participants. These employees were all members of the Union. The strike was called by the Union at a meeting which every member was entitled to attend, and the strike action received the complete support of every member present. Each of these employees received the Company's letter of February 29th, informing him that "participants" in the strike would be considered to have forfeited any rights as employees. No employee took any steps to indicate that he was not a participant. He had a right to claim and to establish that he was a non-participant. By choosing to remain silent and taking no steps to disavow the action of their agent, despite the invitation from the Company to take such steps, these employees were found by the Board to have acquiesced in, ratified, and become parties to their agent's action. The question was one of fact, and there was evidence on the record as a whole to support the Board's conclusion. We find no merit in UE's argument that the Board's decision on this phase of the case rested upon an inference of guilt from union membership. The record supports a finding of ratification of the illegal strike activity as a factual matter.

### III

■ The next point concerns employees who were at the time of the strike in a lay-off status. The contract between the Company and UE accorded laid-off employees a priority in filling vacancies. The Company did not accord these people this priority but rather notified them that they might secure employment by applying as new employees. UE says the Company took this course in order to discourage union membership and thus violated Section 8(a) (3) of the statute. The Company says its course was motivated entirely by the fact that the contract had been terminated. The Board found no evidence in the record to rebut the contention of the Company and therefore concluded the failure to recall these employees was not shown to have been discriminatorily motivated.

UE says the Company had a policy, apart from the contract, of seeking out and reemploying former employees. And it says the uneconomic departure from this normal practice demonstrates the sole motive to have been discouragement of union membership. It buttresses this argument by stressing the fact that the advertisement for new workers was issued two days before the formal rescission of the contract. The Board found no evidence to show a practice and policy

---

10. Phelps Dodge Corp. v. National Labor Relations Board, 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271.

on the part of the Company. And it found the evidence failed to make out a motivation of discrimination. We find no sufficient basis to disturb these conclusions, matters peculiarly within the area confided to the Board and its function as fact-finder. While there was a bit of evidence indicating a practice apart from the contract, it was a very minute bit; the matter was clearly controlled by the contract, and the contract had been breached by the Union, the representative of all the employees, and was in process of being formally terminated. It seems to us the Board was correct in its view that the contractual rights of these employees could not survive the breach of the contract by the Union, and its evaluation of the evidence was accurate.

## IV

■ The next point concerns the refusal of the Company to bargain with UE after the strike had been called. As to such a refusal on February 28th, the Board reasoned that, even if UE was still the bargaining representative of the employees, the Company was under no obligation to bargain in the absence of notification that the illegal strike had been terminated. This has been the policy of the Board.[11] In the Times Publishing Company case[12] the Board held that a union's refusal to bargain in good faith may remove the possibility of negotiation and thus preclude a finding of a violation by an employer of his duty to bargain. The Report of the House Committee specifically cited that case as obviously correct.[13] As we have indicated, when UE, seeking modification of an existing contract by proposing wage adjustments into the agreed scale, called a strike in flat violation of the contract and of the explicit terms of Section 8(d) of the Act, it was guilty of failure to bargain in good faith as that term is defined in Section 8(d). The statute has in it many provisions valuable to labor organizations, and protects them in the exercise of their rights, but it does not give them authority to violate the Act wantonly and at the same time to insist upon full measure of the privileges afforded them when proceeding properly. The Board found that on February 28th the Company had no notice of the termination of the strike. That finding is supported by the record and properly leads to the conclusion that the Company did not violate the Act in refusing to bargain with UE on that date.

■ After February 28th UE made no further efforts to bargain until March 27th. An overture on that date was rejected by the Company, as were all others subsequent thereto. The Board concluded that on those occasions there were no violations of the statute, if UE no longer represented a substantial and representative segment of the Company's normal working force. That rule is well established[14] and is not attacked here. UE urges that it did represent a substantial number of the employees at the times involved. But, as we have pointed out, except for four individuals not here involved the persons whom UE represented at these later dates were no longer employees of the Company. We agree with the conclusion of the Board that the Company was under no obligation to bargain with UE on these occasions.

## V

■ The final question is whether the Company violated the Act by locking

11. Higgins, Inc., 90 N.L.R.B. 184 (1950); United Elastic Corporation, 84 N.L.R.B. 768 (1949); Dorsey Trailers, Inc., 80 N.L.R.B. 478 (1948), affirmed in relevant part, 5 Cir., 1950, 179 F.2d 589; Charles E. Reed & Co., 76 N.L.R.B. 548 (1948).

12. 72 N.L.R.B. 676 (1947).

13. H.R.Rep.No. 245, 80th Cong., 1st Sess. 27 (1947).

14. J. I. Case Co. v. National Labor Relations Board, 1944, 321 U.S. 332, 337, 64 S.Ct. 576, 88 L.Ed. 762; National Labor Relations Board v. Sands Mfg. Co., supra, note 9; National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 262, 59 S.Ct. 490, 83 L.Ed. 627.

the gates to the plant. The Board found that the decision to close the plant was motivated by economic considerations. UE urges that the action was motivated by discriminatory reasons. The record indicates that at the time of the lockout the Company did not know how long the strike would last. In addition the evidence tended to show that it would not have been economically sound to operate the plant with the second and third shifts alone. The Board's finding is supported by the record as a whole.

Affirmed.