JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* CARIBBEAN CONTAINER CO., demandada.

Número: JRT-63-10          Resuelto: 24 de diciembre de 1963

*J. B. Fernández Badillo, Procurador General, José Orlando Grau,* y *Celia J. Canales de González,* abogados de la peticionaria; *Celestino Morales, Jr.,* y *Francisco L. Acevedo Nogueras,* abogados de la demandada.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

En 2 de mayo de 1963 la Junta de Relaciones del Trabajo de Puerto Rico, después de adoptar las conclusiones de hecho y de derecho del oficial Examinador Lic. Miguel Velázquez Rivera y de hacer suyas las recomendaciones de dicho funcionario, emitió una decisión y orden determinando que la querellada Caribbean Container Co. había incurrido en una práctica ilícita de trabajo dentro del significado del Art. 8(1)(f) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 69(1)(f),[1] y en consecuencia le requirió para, en lo que es pertinente,

"1—Cesar y desistir de:
    a) En manera alguna violar los términos del convenio colectivo, o acuerdo para aceptar un laudo de arbitraje, que tiene firmado o que firme con la Unión de Empleados de la Industria de Envases de Cartón (Independiente) o con cualquiera otra organización obrera de sus empleados."

"2—Tomar la siguiente acción afirmativa que consideramos que efectúa los propósitos de la Ley.
    a) Acceder a que el Comité de Quejas y Agravios, reunido con el Quinto Miembro designado por el Hon. Secretario del Trabajo, en la forma dispuesta por el Inciso (4) del artículo XIII del convenio colectivo, decida si la controversia entre las partes, con respecto al empleo de antiguos trabajadores es o no arbitrable; y en el caso en que decidiese afirmativamente la cuestión previa de la arbitrabilidad, acceder a que el Comité de Quejas y Agravios, constituido en la forma anteriormente descrita, decida los méritos de la controversia."[2]

---

[1]"Será práctica ilícita de trabajo el que un patrono . . .
"(f) Viole los términos de un convenio colectivo, incluyendo un acuerdo en el que se comprometa a aceptar un laudo de arbitraje, esté o no dicho acuerdo incluido en los términos de un convenio colectivo. . . ."

[2]El oficial examinador había recomendado el siguiente texto: "Acceder a que el Comité de Quejas y Agravios discuta y adjudique si la Querellada violó o no el convenio colectivo al negarse a despedir a empleados que no habían trabajado para la empresa antes del 13 de marzo de 1962 y al negarse a emplear a antiguos trabajadores de la empresa."

En oposición a la solicitud de la Junta para que se ponga en vigor la orden transcrita, la recurrida, en términos generales, ataca las determinaciones de hecho que sirvieron de fundamento a la misma por constituir una "narración parcial," ser erróneas y no estar sostenidas por la prueba ofrecida. Se queja también de que se omitió toda consideración de la evidencia producida por la querellada. Específicamente señala la comisión de varios errores que discutiremos oportunamente.

Es de rigor referirnos brevemente a los hechos que han dado margen a la controversia. Del informe del Oficial Examinador que presidió la vista tomamos la siguiente relación parcial: (³)

"La Unión de Empleados de la Industria de Empresas de Cartón había sido por largo tiempo la representante exclusiva de los empleados de la querellada incluidos en la unidad apropiada de negociación colectiva. Allá para el mes de marzo de 1962 la Unión y la Corporación querellada estaban enfrascadas en negociaciones encaminadas hacia la firma de un nuevo convenio colectivo de trabajo que gobernaría las relaciones obrero-patronales de la empresa durante los próximos años. El día 13 de marzo de 1962, sin haber notificado al Negociado de Conciliación y Mediación del Gobierno de los Estados Unidos, la Unión ordenó a los miembros de su matrícula que iniciaran una paralización de las labores en la empresa. Así, en efecto, aconteció. Los trabajadores afiliados a la Unión no sólo abandonaron sus labores habituales con la compañía sino que realizaron actividades concertadas de protesta que incluyeron el establecimiento de piquetes frente a la entrada principal del local en el cual está ubicada la fábrica propiedad de la corporación.

"El patrono, por su parte, se quejó de la actuación de la organización obrera ante los oficiales de la Junta Nacional de Relaciones del Trabajo de Puerto Rico. Una vez la susodicha instrumentalidad federal hubo realizado la investigación preliminar del

---

(³) Hemos omitido copiar aquellas determinaciones que a nuestro juicio no están sostenidas por la evidencia presentada, aunque algunas de ellas constituyen inferencias permisibles a la luz de la consideración en conjunto de todas las circunstancias que reveló la prueba.

caso, pudo comprobarse que, en verdad, la Unión no había cumplido con el requisito contenido en la Ley Federal de Relaciones Obrero-Patronales de 1947 al efecto de que debe notificarse al Negociado de Conciliación y Mediación del Departamento del Trabajo Federal con anterioridad al momento en que una organización obrera decrete una huelga en este tipo de casos. En consecuencia, los oficiales de la Junta Nacional requirieron de la Unión que pusiera fin al brote huelgario . . .."

La prueba demuestra que la Unión retiró los piquetes que había establecido frente a la fábrica de la querellada pero los obreros no se reintegraron a las labores. ([4]) Ante esta situación,

". . . la compañía publicó anuncios en los periódicos del país ofreciendo empleo a trabajadores que lo interesaran. En esta forma escogieron a un grupo de sesenta (60) nuevos empleados, los cuales prestaron servicios a la empresa durante parte del período huelgario. Sin embargo, al recrudecerse los actos de violencia, la compañía notificó a todos estos nuevos empleados que, ante el peligro de ser agredidos físicamente, no debían concurrir al trabajo sino que debían mantenerse en constante comunicación telefónica con la empresa ([5]) . . . . Un total de dieciocho (18) de estos nuevos empleados cumplieron con las instrucciones específicas de la empresa a este respecto.

---

([4]) El Oficial Examinador determinó que "La Unión accedió al requerimiento de la Junta Nacional y se *reanudaron* los trabajos de la compañía." Esta determinación no tiene base en la prueba admitida, que demuestra que después del 13 de marzo la labor se realizó por empleados administrativos y de supervisión y por otros obreros que no eran miembros de la Unión y que fueron reclutados por la empresa.

Respecto al regreso al trabajo de los obreros existe un marcado conflicto pues mientras la empresa sostiene que estos continuaron la huelga bajo el pretexto de declararse en "asamblea permanente," y que no atendieron requerimientos escritos para que se reintegraran a la labor, la Unión alega que la compañía no les permitió la entrada a la planta hasta tanto se firmara el convenio. Este conflicto no fue dirimido por el examinador, pero tampoco es un hecho que sea indispensable para resolver la controversia.

([5]) El examinado añadió que el propósito de la comunicación telefónica era "garantizarles la permanencia en el empleo cuando se lograra nuevamente la normalidad en las operaciones de la corporación." Esta afirmación no tiene base en la prueba, aunque es una inferencia razonable del cuadro de los hechos.

"El 27 de abril de 1962 las partes llegaron a un acuerdo. Por consiguiente, se procedió a firmar un convenio colectivo de trabajo que estaría vigente hasta el 26 de abril de 1965.([6]) Fue punto crucial en las negociaciones que finalmente culminaron en la firma del convenio colectivo la petición de la Unión de que la Compañía reempleara a todos los antiguos trabajadores que habían ido a la huelga, despidiendo si ello fuera necesario a los nuevos trabajadores empleados durante el período de la paralización de los trabajos. La Compañía en todo tiempo se negó a acceder a esta solicitud. Por el contrario, mantuvo la tesis de que los trabajadores que se habían ido a la huelga habían perdido su condición de empleados, razón por la cual los nuevos trabajadores tenían legítimo derecho a conservar sus puestos.

"Se suponía que los trabajadores se reintegraran a sus labores el 30 de abril de 1962, pero tal no fue el caso. Surgió una nueva controversia relacionada con la forma en que se llamarían a trabajar a los antiguos empleados de la empresa. Finalmente, a mediados de mayo de 1962, se llegó a un acuerdo para retornar al trabajo a base de las circunstancias peculiares de esta corporación. Para la fecha que se decretó el paro huelgario original la Compañía empleaba un total de ciento treinta y cinco (135) trabajadores. Como la empresa querellada funciona a base de producir artículos tan sólo en relación con órdenes recibidas, al finalizar la huelga no estaba en condiciones de reanudar sus operaciones utilizando de nuevo a la totalidad de los ciento treinta y cinco (135) empleados. Por razón de ello, las partes acordaron

---

([6]) Además del convenio colectivo se firmó un "acuerdo de empleo" que lee como sigue:

"1.—La Unión, reconocida por la Compañía, ejecutará el acuerdo Suplementario que se une.

"2.—La Compañía, empleará antiguos trabajadores como sigue:
"Todas estas personas serán puestas en una lista.
"Ninguna otra persona será empleada hasta que todos los que cualifiquen que están en dicha lista, se les haya ofrecido empleo. empleo.
"Personas que ahora o después fueren convictas de conducta criminal en conección [sic] con la huelga, serán borradas de la lista.
"El orden de empleo, el número de personas a ser empleadas, el tiempo de empleo y la determinación de cualificaciones serán derecho absoluto de la Compañía.

"3.—La Unión es aquí reconocida como representante para contratar colectivamente."

que la compañía iniciara sus operaciones con un número limitado de trabajadores, estableciéndose turnos rotativos a base de una lista preferencial, de suerte que todos los antiguos empleados tuvieran oportunidad de recibir ingresos en lo que se normalizaban las operaciones fabriles. También se establecería una lista de espera de antiguos empleados para llamarlos de nuevo a trabajar según se presentara la oportunidad. Los trabajadores retornaron a sus labores habituales pero la compañía mantuvo en sus puestos y llamó a trabajar en el primer turno a los dieciocho (18) empleados que no habían participado en la huelga y que habían comenzado a prestar servicios en el período comprendido entre el 13 de marzo y el 27 de abril de 1962.[7]

"El 28 de mayo de 1962 la Unión se dirigió por escrito a la Corporación querellada quejándose de que la Compañía había violado los acuerdos que habían puesto fin al conflicto huelgario. La queja de la Unión estaba fundada en la alegación de que la Compañía estaba dando trabajo a un grupo de nuevos trabajadores mientras algunos de los antiguos empleados continuaban sin oportunidad de empleo.[8] Esa carta fue aclarada por otra de 15 de junio de 1962,[9] en la cual la Unión insistía en que la

---

[7] Parece conveniente agregar que en esta etapa de la controversia la Unión pretendía que los 18 empleados "nuevos" participaran en el sistema de turno, a lo cual la empresa denegó. La posición de la querellada es que se convino que esos 18 empleados trabajarían sin interrupción, y que el sistema de turnos se refería únicamente a los "viejos" trabajadores.

[8] "Antes de proceder dentro de los términos de la Ley, nos permitimos indicarles que esa Compañía ha estado violando los acuerdos firmados con esta Unión y que dieron fin al pasado conflicto huelgario. El Convenio Colectivo vigente y la estipulación que forma parte del mismo, específicamente indican que los trabajadores a ser incluidos en la lista para llamarse a trabajar deben ser los antiguos trabajadores de esa Compañía.

"La violación antes indicada consiste en que mientras hay un considerable número de obreros antiguos sin trabajo, esa Compañía ha empleado un crecido grupo de nuevos trabajadores para realizar las mismas labores que efectuaban los antiguos obreros suspendidos.

"En virtud de lo anterior solicitamos la reposición en el trabajo de todos los obreros antiguos suspendidos dentro de un plazo de 72 horas a partir de la fecha de esta carta."

[9] "Ampliando mi carta de mayo 28 de 1962 al señor R. A. Pacheco deseamos indicar que la violación al Convenio Colectivo vigente que reclamamos consiste en que mientras hay trabajadores permanentes miembros de la Unión sin trabajar, la Compañía está empleando trabajadores temporeros en la fábrica."

violación del convenio imputada a la querellada era la de que ésta estaba empleando trabajadores temporeros en la fábrica a pesar de que había trabajadores permanentes, que eran miembros de la Unión, que no estaban recibiendo oportunidad de trabajar.

"El 15 de junio de 1962 representantes de la Unión y del patrono sostuvieron una reunión para tratar de resolver la controversia surgida. Al no llegar a un acuerdo ambas partes redactaron y firmaron una carta dirigida al Secretario del Trabajo de Puerto Rico pidiendo a éste que designara un quinto miembro para que entendiera en la controversia. [10] Ya desde el 31 de mayo de 1962 la querellada había informado por escrito a la Unión que su posición era la de que ella no había violado el convenio colectivo. En la propia carta, sin embargo, la querellada había sugerido a la Unión que lo más indicado era seguir los canales que provee el convenio para resolver la controversia. [11]

"El árbitro designado por el Secretario del Trabajo, a solicitud de las partes, se reunió con éstas pero no pudo asumir jurisdicción sobre la controversia porque el patrono y la Unión no se pusieron de acuerdo sobre la forma en que se redactaría la sumisión. Mientras la Unión sostenía que el punto crucial en controversia era el de determinar si la Compañía había violado el convenio colectivo al emplear nuevos trabajadores, en perjuicio de los antiguos empleados, la querellada alegaba que lo que debía someterse al árbitro era la determinación de si la Compañía había empleado o no menos trabajadores con posterioridad a la firma del convenio colectivo. Finalmente, la empresa asumió la posición de que la solicitud de la Unión no era una arbitrable bajo el convenio y se retiró de los procedimientos. En ningún momento la empresa propuso o sugirió al quinto miembro que éste determinara, como cuestión jurisdiccional pre-

---

[10] "Respetuosamente solicitamos de usted designe un quinto miembro para que entienda en el caso del epígrafe, de acuerdo a lo dispuesto en el Convenio Colectivo firmado entre esta Compañía y la Unión de Trabajadores de la Industria de Envases de Cartón."

[11] "Deseamos indicarle que esta Compañía entiende que no ha violado ni está violando el presente Convenio Colectivo y acuerdos suplementarios firmados con esa Unión el 27 de abril de 1962. Que para resolver cualquier malentendido o controversia que pueda existir entre las partes, lo más indicado es seguir los canales que provee el presente Convenio Colectivo para este propósito."

via, si·la controversia que planteaba la Unión era o no arbitrable. (¹²)

1—Partiendo de la premisa básica que ha informado todas sus actuaciones a través de la controversia—los empleados que participan en una acción concertada ilegal y se abstienen de regresar al trabajo al ser requeridos para ello pierden su condición de empleados permanentes, y, por tanto, la empresa está en libertad de emplear a las personas que estime conveniente—se señala que la Junta Estatal erró al dictar la orden que se impugna, pues no se trataba de una controversia entre un miembro de la Unión o empleado de la compañía y ésta. Elaborando el apuntamiento se arguye que la queja planteada se refiere a personas que no han sido empleadas con posterioridad a la huelga ilegal, y que, por tanto, no han adquirido el *status* de empleados.

■ Si bien es cierto que la cláusula jurisdiccional del convenio sobre el procedimiento para mediar y ajustar las quejas y agravios se refiere a una controversia "entre la Unión y la compañía o cualesquiera de sus oficiales o representantes en que se alegue la violación por parte de la compañía que envuelva la interpretación y/o cumplimiento de este convenio o de cualesquiera de sus cláusulas," resulta especioso el razonamiento adelantado por la querellada pues el alcance de la orden es precisamente establecer, como primera providencia, si la controversia es arbitrable. Corresponde al árbitro determinar si en verdad se trata de un asunto cubierto por el convenio o el acuerdo anexo. En cuanto a este particular la posición de ia empresa es que la controversia no es arbitrable porque, en las propias palabras de su Director de Personal, "afectaba directamente a un grupo de empleados que no eran empleados permanentes de la compañía . . . que el artículo de arbitraje tiene que ver con empleados permanentes de la compañía miembros de la unión" (R.T., págs. 60–61), mientras la Unión sostiene un criterio

(¹²) Añadimos, tampoco lo sugirió la Unión.

contrario indudablemente fundándose en que el acuerdo de empleo que se firmó coetáneamente con el convenio tuvo el efecto de borrar, si ello fuere necesario, cualquier alegación que pudiera formularse sobre el *status* de los empleados por razón de su participación en la huelga, ya que la compañía se obligó a emplear los "antiguos" trabajadores y expresamente convino en que "[*n*] *inguna otra persona será empleada* hasta que todos los que cualifiquen que estén en dicha lista, se les haya ofrecido empleo." No se trata, como pretende hacerse ver, de una controversia con empleados individuales, sino de la interpretación y alcance de reglas de trabajo—selección de personal—conforme a los acuerdos que rigen las relaciones de las partes. ([13])

■ 2—Tampoco asiste la razón a la querellada al señalar que la orden de la Junta se basa en que la compañía venía obligada a aceptar la sumisión propuesta por la Unión. De la relación de hechos que antecede se deduce que entre la organización obrera y la compañía surgió una diferencia sobre las reglas de empleo de los trabajadores, y que ante la imposibilidad de llegar a un acuerdo, *ambas partes* solicitaron se designara un quinto miembro para que entendiera en la alegación de violación de convenio que mantenía la Unión, siguiendo así la sugestión del representante del patrono de

---

([13]) El Art. 8(d) de la Ley Federal de Relaciones Obrero-Patronales dispone expresamente que "Cualquier empleado que se levante en huelga dentro del período de sesenta días especificado en esta subdivisión perderá, para los efectos de los artículos 8, 9 y 10 de esta Ley, según enmendada, su condición de empleado del patrono envuelto en la disputa obrera en cuestión, pero tal pérdida de condición para dicho empleado cesará si éste es y cuando sea reemplazado por dicho patrono."

El período de espera de sesenta días a que se refiere este artículo comienza a correr desde que se notifica el deseo de terminar o modificar el convenio colectivo existente. Obedece al propósito de despejar a las partes de la presión económica que representa una huelga o cierre durante el período de negociación, *Mastro Plastics Corp.* v. *Labor Board*, 350 U.S. 270 (1955). Véanse además, *United Elec. R. & M. Wkrs.* v. *National Labor Rel. Bd.*, 223 F.2d 338 (D.C. Cir. 1955); *Boeing Airplane Co.* v. *National Labor Relations Bd.*, 174 F.2d 988 (D.C. Cir. 1949).

que "lo más indicado es seguir los canales que provee el presente convenio colectivo para este propósito."

No puede escaparse al más ingenuo que la posición de las partes es clara y que ambas están advertidas de lo que cada una sostiene y pretende. Ahora bien, como la compañía insiste en que la controversia no es arbitrable por la razón apuntada sobre la falta de permanencia de los empleados representados por la Unión y afectados por el empleo preferente de 18 obreros que no participaron en la acción concertada y que fueran reclutados por la compañía durante el paro, la Junta sabiamente enmendó el informe del Oficial Examinador y ordenó que ésta fuera la primera cuestión a dilucidarse por el árbitro. Nota, *Arbitration: Scope of the Arbitrable Dispute: Dispute Arbitrable Even Though Prima Facie Without Merit*, 9 U.C.L.A. L. Rev. 218 (1962). Sostener una posición contraria sería conceder un poder de veto absoluto a cualquiera de las partes que podría con simplemente adoptar la posición de que una disputa no es arbitrable, frustrar el propósito de este mecanismo dirigido a dirimir las diferencias que surjan mediante un procedimiento rápido y sencillo. Sobre la naturaleza del arbitraje industrial y los casos en que típicamente se aplica, recomendamos la lectura del artículo *"Reflections on the Nature of Labor Arbitration"* por el Profesor R. W. Fleming, de la Universidad de Illinois, 61 Mich. L. Rev. 1245 (1963), para que se confronte con *Pérez* v. *Autoridad de Fuentes Fluviales*, 87 D.P.R. 118 (1963).

■ 3—Se aduce que la evidencia presentada no sostiene las determinaciones de la Junta. Hemos examinado el récord de los procedimientos y, con excepción de los puntos que hemos señalado en la narración de los hechos—que no afectan sustancialmente la validez de las actuaciones de la Junta—encontramos que existe base suficiente para las conclusiones anunciadas. No cabe duda que todas las circunstancias indican que la compañía, después de sugerir ella misma que se

recurriera al procedimiento de arbitraje, se ha negado a participar en forma efectiva tal cual lo requiere el convenio, y si esto no fuera suficiente, el acuerdo de 15 de junio requiriendo la designación de un quinto miembro.

Los otros planteamientos no requieren discusión.

■ Aun cuando no ha sido expresamente planteado estimamos que la orden de la Junta para cesar y desistir es demasiado amplia, conforme a los criterios esbozados en *J.R.T.* v. *Ceide*, 89 D.P.R. 674 (1963). Nada hay que justifique extenderla más allá de violaciones del convenio y los acuerdos vigentes.

*Se modificará la orden de la Junta de Relaciones del Trabajo en la forma expuesta en esta opinión, y así modificada, se confirmará.*