SHEET METAL WORKERS, LOCAL UNION NO. 91, Affiliated with Sheet Metal Workers International Association, AFL–CIO, and Sheet Metal Workers International Association, AFL–CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 89–1458.

United States Court of Appeals, District of Columbia Circuit.

Argued April 30, 1990.

Decided June 12, 1990.

Donald W. Fisher, Toledo, Ohio, with whom Judith E. Rivlin, Washington, D.C., was on the brief, for petitioners.

Barbara J. Sapin, Atty., N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Jerry M. Hunter, Gen. Counsel, and Judith A. Dowd, Supervisory Atty., N.L.R.B., were on the brief, for respondent.

Before EDWARDS, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The issue in this case is whether respondent, National Labor Relations Board ("NLRB" or "Board"), properly determined that contractual language drafted by petitioners Sheet Metal Workers International Association ("International") and Sheet Metal Workers Local Union No. 91 ("Local No. 91") (collectively ·"Union") amounts to an unlawful "hot cargo" clause. The language in question committed employers to disclose any affiliation with nonunionized sheet metal contractors, and authorized Local No. 91 to rescind its collective bargaining agreement with any employer so affiliated. The Board found that this provision constituted an agreement to engage in unlawful secondary activity in violation of section 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e) (1988), and that Local No. 91 had pursued employer assent to the provision by unlawful coer-

cive means in violation of section 8(b)(4)(ii)(A), *id.* § 158(b)(4)(ii)(A).

We grant in part and deny in part both the Union's petition for review and the Board's cross-application for enforcement. We find no basis for upsetting the Board's determinations that the disputed contract language, considered as a whole, violates section 8(e) and that the Union violated section 8(b)(4)(ii)(A) by pursuing employer agreement to this language by coercive means. Nonetheless, we conclude that the Board unreasonably failed to address the Union's argument that the disputed language could be cured by severing the provision authorizing contractual rescission. Consequently, we remand for further consideration of that issue.

## I. BACKGROUND

This case arises from International's concern with contractors who operate both unionized and nonunionized shops—so-called "double breasted" employers.[1] Describing this phenomenon as "one of the most serious threats to the union sheet metal industry," International announced to its locals a policy designed to force employers to "make a decision that they are either 100% union or 100% non-union." Memorandum from E. Carlough, General President, & C. Clay, General Secretary–Treasurer, Sheet Metal Workers International Association, to Business Managers of Building Trades Local Unions at 1 (Mar. 22, 1985) ("Policy Memorandum"), *reprinted in* Joint Appendix ("J.A.") 291.

The centerpiece of this policy was a proposed collective bargaining provision known as the "Integrity Clause." In three separate sections, the Integrity Clause defines a unionized contractor who also operates a nonunionized shop, or who is affiliated with a company operating a non-unionized shop, as a "bad faith employer" ("section one"); mandates that the contractor notify the local should the contractor become a "bad faith employer" ("section two");[2] and provides that in such an event the local is entitled to rescind the collective bargaining agreement ("section three").[3] Under the policy devised by International, locals were to demand that employers include the Integrity Clause as a part of existing collective bargaining agreements. *See* Policy Memorandum at 2, *reprinted in* J.A. 292. Employers who refused were to be informed that they were no longer eligible for so-called "Resolution 78" relief, *i.e.*, discretionary wage and benefit concessions awarded by the Union to help individual employers remain competitive with nonunionized employers.[4] *See id.*

Local No. 91 pursued this strategy with a number of employers, including the Winger Contracting Company ("Winger") and the Schebler Company ("Schebler").[5] After initial resistance, Winger joined several other contractors in assenting to the Integrity Clause. Schebler, however, refused to accept the clause on the ground that its affiliation with a nonunionized contractor would make Schebler a "bad faith employer." Local No. 91 thereafter refused Schebler's numerous requests for Resolution 78 relief, causing Schebler to lose contracts to nonunionized contractors and, on at least one occasion, to a unionized contractor that had signed the Integrity Clause and received Resolution 78 conces-

---

1. The facts comprising the background of this case are undisputed.

2. Failure to provide such notice is deemed "fraudulent conduct" under the Integrity Clause and is subject to liquidated damages of $500 per day. *See* Integrity Clause § 2.

3. The Integrity Clause is reprinted in the appendix to this opinion.

4. Adopted by International in 1982, Resolution 78 authorizes locals to grant employers such concessions on a case-by-case basis.

5. Illowa Sheet Metal Contractors Association ("Illowa"), the employer bargaining association apparently representing a majority of the contractors located in the territorial jurisdiction of Local No. 91, refused to adopt the Integrity Clause as a modification of its existing collective bargaining agreement or as part of a new agreement. Local No. 91 nonetheless sought to negotiate modifications of the basic Illowa contract with individual members of the association.

sions. *See* J.A. 52–55.[6] In response to Schebler's complaints, the Union replied that "once Schebler Company guarantees Sheet Metal Workers everywhere they are a 100 percent union contractor, then we will in return guarantee them our 100 percent cooperation in making them competitive on every non-union job they are bidding." *Id.* 295.

Rather than adopt the Integrity Clause, Schebler filed an unfair labor practice charge against the Union, and a complaint was issued by the Board's General Counsel. Following a hearing on the complaint, an Administrative Law Judge ("ALJ") found the Union guilty of the unfair labor practices as charged. The ALJ concluded that the Integrity Clause was intended to cause employers to cease doing business with nonunionized affiliates in order to promote union interests outside of Local No. 91's contractual work units. *See id.* 58–64. Consequently, the ALJ found that the incorporation of the Integrity Clause in Local No. 91's contract with Winger violated section 8(e). The ALJ also found that Local No. 91 sought to "coerce" Schebler into signing the clause by denying it Resolution 78 relief, a violation of section 8(b)(4)(ii)(A). *See id.* 76–81. The ALJ ordered the Union to cease and desist from enforcing the Integrity Clause in its contract with Winger and from withholding Resolution 78 Relief as a means of coercing Schebler into signing the Integrity Clause. *See id.* 82–85. The Board subsequently adopted the ALJ's decision, including both his opinion and the proposed remedy. *See Sheet Metal Workers Local Union No. 91 Affiliated with Sheet Metal Workers Int'l Ass'n, AFL–CIO*, 294 N.L.R.B. No. 61, slip op. at 1–2 (June 7, 1989), *reprinted in* J.A. 114–15.[7]

The Union petitions for review, challenging the Board's finding that the Union violated sections 8(e) and 8(b)(4)(ii)(A). The Board cross-applies for enforcement of its order.

## II. ANALYSIS

### A. *Section 8(e)*

Section 8(e) provides that

[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ... agrees ... to cease doing business with any other person....

29 U.S.C. § 158(e). The Union challenges the Board's conclusion that the Integrity Clause comes within the scope of section 8(e). According to the Union, the Integrity Clause does not require *employers* to cease doing business with nonunionized affiliates but rather protects *the Union's* legal right not to represent the employees of double-breasted contractors. In the alternative, the Union contends that the Board should have left intact sections one and two of the Integrity Clause, invalidating only section three's rescission remedy. We examine these claims in turn.

#### 1. Lawfulness of Integrity Clause as a Whole

At the outset, we reject the Union's claim that the Integrity Clause is somehow immune from legal scrutiny because it implements the Union's right to decide with whom it will bargain. We need not determine whether the Union is correct in its claim that it may decline *to establish* (or to renew) a collective bargaining agreement for any reason that it chooses. For even assuming that this is so, it does not follow that the Union can make *the formation* (or the continuation) of such a contract contingent on the employer's *agreement* to terms that are unlawful under the NLRA; because the NLRA places limits on what the parties can agree to, the supposed "greater" power not to enter a collective

---

6. After losing this contract, Schebler filed a grievance against Local No. 91 based on their agreement's "most favored nations" clause. But because Schebler had failed to request Resolution 78 relief in connection with the specific project in question, the National Joint Adjustment Board denied the grievance. *See id.* 54.

7. The Board also affirmed the ALJ's conclusion that the Union had waived any reliance on the "construction industry proviso" of section 8(e). *See id.* at 1 n. 1, *reprinted in* J.A. 114 n. 1. The Union does not seek review of this determination.

bargaining agreement does not include the "lesser" power to condition an agreement on any term that a union or employer cares to propose. We turn, then, to the question of *whether* the Integrity Clause is unlawful under section 8(e).

■ The elements of a section 8(e) violation are well established. As the text of the statute plainly states, the Board must find an "agreement, express or implied, ... to cease doing business with any other person." 29 U.S.C. § 158(e). This agreement, moreover, must be "secondary" in nature. *See National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 643–45, 87 S.Ct. 1250, 1267–68, 18 L.Ed.2d 357 (1967). That is, to be unlawful, the agreement must be designed not solely to "improv[e] the [primary employer's] employees' wages, hours, and working conditions," but also "to satisfy union objectives elsewhere." *Id.* at 643, 644, 87 S.Ct. at 1267–68, 1268; *see California Cartage Co. v. NLRB*, 822 F.2d 1203, 1207 (D.C.Cir.1987). Because a determination that a particular agreement violates section 8(e) involves "the Board's ... 'special function of applying the general provisions of the [NLRA] to the complexities of industrial life,'" we defer to the Board's determinations so long as they are reasonable, *Local Union 1395, Int'l Bhd. of Elec. Workers v. NLRB*, 797 F.2d 1027, 1030 (D.C.Cir.1986) (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149–50, 10 L.Ed.2d 308 (1963)), and are supported by substantial evidence, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–90, 71 S.Ct. 456, 463–66, 95 L.Ed. 456 (1951).

Applying these principles, we have little difficulty upholding the Board's conclusion that the Union violated section 8(e) by securing inclusion of the Integrity Clause as a part of its collective bargaining agreement with Winger. The Board reasonably determined that the Integrity Clause constitutes an agreement to "cease doing business" for purposes of the statute. This language has been construed to include more than just circumstances where a pri-

mary employer effects a "complete termination of [its] business relationship" with a neutral employer; the case law makes it clear that "cease doing business" also extends to situations where a primary employer exerts any pressure calculated to cause a significant change or disruption of the neutral employer's mode of business. *NLRB v. Local 825, Int'l Union of Operating Engineers*, 400 U.S. 297, 304–05, 91 S.Ct. 402, 407–08, 27 L.Ed.2d 398 (1971); *see Associated General Contractors, Inc. v. NLRB*, 514 F.2d 433, 437 & n. 6 (9th Cir.1975). Under the Integrity Clause, primary employers, upon pain of losing their collective bargaining agreements, are obliged either to terminate their relationships with their nonunionized affiliates or to induce those affiliates to *become* unionized.[8] Either outcome is within the ambit of section 8(e).

The Union's argument that the Integrity Clause does not *require* contractors to discontinue their relations with nonunionized affiliates misconceives the scope of section 8(e). By prohibiting certain secondary activity based on "express *or* implied" agreements, section 8(e) was intended to close a loophole in section 8(b)(4)(ii)(B) through which unions used "hot cargo" clauses "to exert subtle pressures upon employers to engage in 'voluntary' boycotts." *National Woodwork Mfrs. Ass'n*, 386 U.S. at 634, 87 S.Ct. at 1263. In the instant case, the Board reasonably concluded that the contract-rescission mechanism of section three exerted the requisite degree of pressure not to deal with nonunionized contractors.

Employers in the contracting industry have a vital interest in receiving the benefits of their contracts, including the unions' obligations to furnish skilled labor and to refrain from striking. *See generally International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770, 773 (3d Cir.) (describing importance to contractors of "[h]aving a guaranteed union contract" in order to make "accurate estimates of their labor costs when they bid on projects"), *cert.*

---

**8.** The Union does not contest the Board's conclusion that unionized employers and their non-

unionized affiliates are distinct employers for purposes of section 8(e). *See* J.A. 60–62.

*denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988). The Union conceded at oral argument that a clause that automatically doubled the wages of employees should the contractor become affiliated with a nonunionized contractor would be tantamount to an "agreement" to cease doing business for purposes of section 8(e). *Cf. International Union, United Mine Workers of America v. NLRB*, 399 F.2d 977, 978–79 (D.C.Cir.1968) (court and all parties assume that an agreement by which employer paid 40 cents into a union welfare fund for every ton of coal it produced itself, and 80 cents for every ton it bought from outside sources, was an "agreement" to cease doing business within section 8(e)). The threatened loss of a collective bargaining agreement is no less penal and hence no less of an implicit agreement not to deal with nonunionized contractors.[9]

The Board also reasonably concluded that the Integrity Clause has a secondary object. Far from seeking to protect only the jobs or benefits of Local No. 91's members, the Integrity Clause *expressly* ties the rescission remedy to the employer's failure to extend collective bargaining benefits to the employees of *nonunionized* neutral employers. Section one defines a "bad faith" employer as one who either operates or is affiliated with a sheet metal contractor "using employees whose wage package, hours, and working conditions are inferior to those prescribed" by the collective bargaining agreement of the relevant

local affiliated with International. Integrity Clause § 1.

The circumstances under which the Union proposed the Integrity Clause buttress the Board's determination that the provision has an unlawful secondary object. In transmitting the Clause to its locals, International baldly characterized the provision as designed to force employers to become "either 100% union"—that is, unionized throughout their affiliated operations—"or 100% non-union." Policy Memorandum at 1, *reprinted in* J.A. 291. Local No. 91 confirmed this understanding of the Integrity Clause when it informed Schebler that it would become eligible for Resolution 78 relief only when it "guarantees Sheet Metal Workers *everywhere* [that Schebler is] a 100 percent union contractor." J.A. 295 (emphasis added). These statements furnish ample support for the Board's factual finding that the Union *intended* the Integrity Clause to have a secondary purpose, a determination to which we owe deference. *See California Cartage*, 822 F.2d at 1208; *Local Union 1395*, 797 F.2d at 1030.

### 2. Severance

■ The Union argues that any illegality in the Integrity Clause could have been cured by severing section three's rescission mechanism. Although we do not pass on the merits of this contention, we conclude that the Board's disposition of the Union's severability claim fails to reflect reasoned decisionmaking.[10]

---

9. The cases cited by the Union in which courts have upheld rescission as a remedy for a *breach* of a collective bargaining obligation, *see, e.g.,* *United Elec., Radio & Mach. Workers v. NLRB*, 223 F.2d 338, 341 (D.C.Cir.1955), *cert. denied,* 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956), only underscore that employers have a *duty* under the Integrity Clause not to affiliate with nonunionized contractors. These cases, of course, do not suggest that a party can insist on rescission as a remedy for an *independently unlawful* secondary obligation.

10. Under section 10(e) of the NLRA, a reviewing court is without authority to consider an "objection that has not been urged before the Board, ... unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e) (1988). Because this bar is jurisdictional, *see Woelke &*

*Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982), we are required, *"sua sponte,* to appraise the record to determine" whether an objection has been effectively preserved for appeal, *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 386 n. 5, 66 S.Ct. 203, 209 n. 5, 90 L.Ed. 145 (1945). Although the question admits of some uncertainty, we conclude that the Union did raise the severability objection before the Board.

The Union's exceptions to the ALJ's decision consist of a series of generalized objections to "[a]ll of page[s]" seventeen through twenty-three, the portion of the ALJ's opinion analyzing the section 8(e) charge. J.A. 110–11. Standing alone, this pleading fails to raise the issue of severability with sufficient specificity. *See Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943) (averment that the hearing examiner erred in " 'each and

The practice of curing an unlawful secondary contract by severing an objectionable clause has foundation in NLRB precedent. *See, e.g., Southern Cal. Pipe Trades Dist. Council No. 16,* 277 N.L.R.B. 1281 (1985) (*"Jamco Development Corp."*). In *Jamco Development Corp.,* the Board severed a "self-help" clause intended to enforce a secondary subcontracting agreement on the ground that the subcontracting agreement standing alone would not conflict with section 8(e). *See id.* at 1283–84. The petitioners maintain that sections one and two of the Integrity Clause would similarly be permissible under section 8(e) if divorced from the rescission remedy.

Counsel for the Board resists the analogy. In *Jamco Development Corp.,* the Board notes in its brief, "[i]t was the linkage between the subcontracting clause and the enforcement provisions of the contract ... that raised a conflict with Section 8(e)," and severance "remedied the violation with minimal intrusion into the parties' voluntary agreement." Brief for the NLRB at 25, 26. "Section Three," however, "is linked by its own terms to the other two sections of the Integrity Clause," and "[s]ince the Union drafted the three sections as a single entity, it is not the responsibility of the Board to sever them in order to keep the Integrity Clause from the reach of Section 8(e)." *Id.* at 26.

We cannot accept these arguments. The characterizations in the Board's brief appear merely to put rather than to answer the question of how *Jamco Development Corp.* can be distinguished from this case. The self-help remedy clause invalidated in *Jamco Development Corp.* was no less "linked" to the underlying subcontracting agreement than is section three's rescission remedy to the disclosure obligations of sections one and two; and like the Integrity Clause, the contract at issue in *Jamco De-*

*velopment Corp.* was "drafted ... as a single entity." In any event, we are constrained to reject these proffered distinctions as merely " 'appellate counsel's *post hoc* rationalizations for agency action.' " *NLRB v. Metropolitan Life Ins. Co.,* 380 U.S. 438, 444, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)). The ALJ's opinion, adopted in full by the Board, fails expressly to address the issue of severability, much less to distinguish *Jamco Development Corp.*

The only portion of the ALJ's opinion that even indirectly bears on the question of severability is equivocal. In rejecting the Union's claim that the Integrity Clause merely obliges contractors to furnish information relevant to the Union's decision whom to represent, the ALJ acknowledged that

> [s]ection 2 ... —the information section— ... standing alone, ... would not establish a secondary object. But taken together with the remainder of the [Integrity] Clause, and in conjunction with the contemporaneous explanation of the [Integrity] Clause, it is clear that the information section is merely part of an overall effort to require the signatory employer to change the operations of its related entities under penalty of contract rescission.

J.A. 64. It is possible to infer from this passage that sections one and two would indeed be lawful if severed from "the remainder of the [Integrity] Clause," in particular section three's "penalty of contract rescission." It is also possible to infer that the Union's "contemporaneous explanation" of the Integrity Clause would condemn sections one and two as secondary in purpose even without section three's rescission remedy.[11] But whatever position

every recommendation' " not sufficiently specific); *Consolidated Freightways v. NLRB,* 669 F.2d 790, 793 (D.C.Cir.1981). Nonetheless, the General Counsel's reply brief to the Board attributes the severability argument to the Union and urges the Board to reject it. *See* Agency Record, Volume III, Document No. 4 at 2. We infer from this pleading that the Union did specifical-

ly raise the severability argument in a supporting brief, although we are perplexed by the absence of any such submission in the Agency Record.

**11.** Under this theory, presumably, the threatened denial of Resolution 78 relief would be the mechanism by which the Union enforces com-

the ALJ might have adopted had he addressed the issue, it is manifest that the Board failed to articulate a reasoned explanation for its rejection of the Union's severability argument, and we are powerless to supply one on the Board's behalf. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

Consequently, we grant the Union's petition on this limited ground and remand for further proceedings. In reconsidering the Union's severability argument, the Board should expressly address the applicability of *Jamco Development Corp.* If on remand the Board decides that sections one and two are severable from section three, it will also need to answer the unresolved question of their lawfulness standing alone. Although the ALJ correctly stated that unions are entitled to information from employers only if the information has "some relevance to the bargaining relationship," J.A. 64, he (and the Board) did not go on to answer whether the information sought here was relevant to the Union's bargaining relationship with the employers, or whether Union conduct as to sections one and two separately was otherwise illegal.

B. *Section 8(b)(4)(ii)(A)*

■ Section 8(b)(4) provides that [i]t shall be an unfair labor practice for a labor organization or its agents—

.     .     .     .     .

(ii) to threaten, coerce, or restrain any person engaged in commerce . . . where . . . an object thereof is:

(A) forcing or requiring any employer . . . to enter into any agreement which is prohibited by [ ]section 8(e). . . .

29 U.S.C. § 158(b)(4)(ii)(A). The Union does not seriously dispute the Board's conclusion that it was "coercive" for the Union to withhold Resolution 78 relief from contractors who refused to sign the Integrity Clause. Section 8(b)(4)(ii) extends to "any form of economic pressure of a compelling or restraining nature." *Associated Gen. Contractors, Inc.*, 514 F.2d at 438. As

pliance with the contractor's implicit agreement

Schebler's lost contracts demonstrate, the withholding of Resolution 78 relief unquestionably created economic pressure to sign the Integrity Clause. Nor does it matter that the Union had no legal obligation to afford Schebler Resolution 78 concessions. It is well established that the otherwise lawful exercise of rights afforded by a collective bargaining agreement can become unlawful when aimed at securing an objective proscribed by section 8(b)(4). *See, e.g., International Longshoremen's & Warehousemen's Union*, 884 F.2d 1407, 1413–14 (D.C.Cir.1989) (filing of grievance unlawful under section 8(b)(4)(ii)(D)).

The sole ground on which the Union contests the determination that it violated section 8(b)(4)(ii)(A) is that the Integrity Clause is not an agreement prohibited by section 8(e). Because we have concluded that the Board properly reached the contrary conclusion, we reject the Union's challenge.

### III. CONCLUSION

For the reasons given above, we grant in part and deny in part both the Union's petition for review and the Board's cross-application for enforcement. The case will be remanded to the Board for a determination whether the unlawfulness of the Integrity Clause can be cured by severing section three's rescission remedy.

*It is so ordered.*

### APPENDIX

### THE INTEGRITY CLAUSE

SECTION ONE: a "bad-faith employer" for purposes of this Agreement is an Employer that itself, or through a person or persons subject to an owner's control, has ownership interests (other than a non-controlling interest in a corporation whose stock is publicly traded) in any business entity that engages in [sheet metal] work . . . using employees whose wage package, hours, and working conditions are inferior to those prescribed in this Agreement or, if such business entity is located or operating

not to affiliate with nonunionized contractors.

in another area, inferior to those prescribed in the agreement of the sister local union affiliated with Sheet Metal Workers' International Association, AFL–CIO in that area.

An Employer is also a "bad-faith employer" when it is owned by another business entity as its direct subsidiary or as a subsidiary of any other subsidiary within the corporate structure thereof through a parent-subsidiary and/or holding-company relationship, and any other business entity within such corporate structure is engaging in [sheet metal] work … using employees whose wage package, hours, and working conditions are inferior to those prescribed in this Agreement, or, … in the agreement of the sister local union … in that area.

SECTION TWO: Any Employer that signs this Agreement or is covered thereby by virtue of being a member of a multi-employer bargaining unit expressly represents to the Union that it is not a "bad-faith employer" as such term is defined in Section 1 hereinabove and, further, agrees to advise the union promptly if at any time during the life of this Agreement said Employer changes its mode of operation and becomes a "bad-faith employer." Failure to give timely notice of being or becoming a "bad-faith employer" shall be viewed as fraudulent conduct on the part of such Employer.

In the event any Employer signatory to or bound by this Agreement shall be guilty of fraudulent conduct as defined above, such Employer shall be liable to the Union for liquidated damages at the rate of $500 per calendar day from the date of failure to notify the Union until the date on which the Employer gives notice to the Union. The claim for liquidated damages shall be processed as a grievance….

SECTION THREE: Whenever the Union becomes aware that an employer has been or is a "bad-faith employer," it shall be entitled, notwithstanding any other provision of this Agreement, to demand that the Agreement between it and such "bad-faith employer" be rescinded. A claim for re-

scission shall be processed by the Union as a contract grievance….