The DOW CHEMICAL COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Steelworkers of America,
AFL–CIO–CLC, Intervenor.

No. 79–2664.

United States Court of Appeals,
Third Circuit.

Argued Sept. 15, 1980.

Decided Nov. 26, 1980.

As Amended Dec. 17, 1980 and
Jan. 8, 1981.

Rehearing and Rehearing In Banc
March 26, 1981.

Kenneth G. McGuiness, Robert E. Williams (argued), Daniel R. Levinson, McGuiness & Williams, Washington, D. C., for Dow Chemical Co.; John E. Dicks, Charles C. Carey, Midland, Mich., of counsel.

David A. Fleischer (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for the N. L. R. B.

Robert M. Weinberg (argued), Michael H. Gottesman, Bredhoff, Gottesman, Cohen, Chanin, Weinberg & Petramalo, Washington, D. C., Warren H. Pyle, Angoff, Goldman, Manning, Pyle & Wanger, Boston, Mass., for intervenor United Steelworkers of America, AFL–CIO–CLC; Bernard Kleinman, Chicago, Ill., of counsel.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Dow Chemical Company (Dow) petitions under section 10(f) of the National Labor Relations Act, (the Act) 29 U.S.C. § 160(f), to review an order of the National Labor Relations Board issued against it in unfair labor practice proceedings in which the United Steelworkers of America, AFL–CIO–CLC (the Union) was the charging party. The Board has cross–petitioned for enforcement of its September 17, 1979 order, which was issued following a remand from this court.[1] That remand resulted from a petition for review filed by the Union seeking review of an earlier Board decision dismissing all its unfair labor practice charges. *United Steelworkers of America, AFL–CIO–CLC v. NLRB*, 530 F.2d 266 (3d Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976).

In its original decision the Board had found that a strike by the Union membership on June 7, 1971, before completion of the final stage of a five–step grievance procedure, was a breach of a no–strike clause in the Collective Bargaining Agreement with Dow, and was not activity protected by section 7 of the Act, 29 U.S.C. § 157. The Board also originally held that the strike had been precipitated by unilateral action by Dow management, unauthorized by the terms of the Collective Bargaining Agreement and thus in violation of section 8(a)(5) of the Act, 29 U.S.C.

---

1. The Board's order is reported at 244 N.L.R.B. No. 129. The Union was granted leave to intervene in this proceeding.

§ 158(a)(5). Relying on its decision in *Arlan's Department Store of Michigan, Inc.*, 133 N.L.R.B. No. 56 (1961), the Board concluded that the company's unilateral action was not so serious an unfair labor practice as to warrant the Union's abandonment of contract remedies and resort to a strike in breach of its no-strike agreement. Thus, it concluded, none of the subsequent company actions in response to the strike were unfair labor practices.[2] The Union, petitioning here, contended in reliance on *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), that once the company committed an unfair labor practice the Union was justified in abandoning contract remedies and resorting to self-help. Thus, it urged, the strike was lawful protected activity, and all the company's subsequent actions in response to it were unfair labor practices in response to that protected activity.

We "decline[d] the invitation to resolve this case by simply pigeon-holing it as within the rule of *Mastro Plastics* or of *Arlan's*." 530 F.2d at 272. Instead we remanded to the Board to consider whether, in view of the developments in the law of labor contracts remedies since the 1956 decision in *Mastro Plastics*, the Board was correct in its conclusion that each action taken by the company in response to a strike in breach of a no-strike agreement was warranted. Dow sought review by the Supreme Court, which the Board, accepting our remand, successfully opposed.[3]

On remand, the Board apparently reconsidered, holding instead, on the same record, that the company's unfair labor practice of instituting a unilateral change in working conditions was a serious unfair labor practice to which the *Mastro Plastics* rule of contract interpretation applied, so that the Union members' strike was protected activity. In thus finding that the strike was not a breach of contract, the Board eliminated the premise upon which we had acted. It never reached the question whether any of the company's actions, albeit in response to a strike in breach of the no-strike clause, might have been unfair labor practices. Thus we are now presented with quite a different case than the one which was argued in September 1975. We grant Dow's petition for review and deny the Board's petition for enforcement.

## I.

### *Facts, Charges, and Initial Decision*

Dow operates a plant at Allyn's Point, Ledyard, Connecticut, where it manufactures plastics and related products. From 1954 until August 9, 1971 it recognized the Union as the bargaining representative of the production employees at the plant. Prior to May of 1971 the plant's latex department was on a seven day a week production schedule. Sixteen latex department employees worked a schedule of seven days on the job and two days off, with rotating shift assignments, while the remaining three worked a regular five day week. In mid-May Dow decided, for economic reasons related to utility costs, to put all latex department employees on a regular five day schedule, with a two day shut down. Dow believed it had the right to do so under the Management Rights clause of the Collective Bargaining Agreement effective from February 23, 1970 through February 26, 1973. That clause authorized it to determine "schedules of production." When the Un-

---

2. The Board's original decision issued on June 28, 1974, is reported at 212 N.L.R.B. No. 50.

3. The Board's memorandum in opposition to Dow's petition for certiorari states:

   The court of appeals did not hold that the Company's acts in this case were necessarily unlawful. It simply remanded the case to the Board for further consideration in light of *Boys Markets* [398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199] and other recent developments, stating that the Board had given insufficient consideration to the Company's decision not to press on to arbitration. Although the Board is prepared to defend its original decision should the Court grant the petition in this case, the Board accepted the remand rather than seek review by this Court. The Board will reconsider its position, as the court of appeals has directed. Review of this case would be appropriate, if at all, only after that process has been completed. (Footnotes omitted).

ion was notified of the proposed change, it took the position that the change was not a matter of management prerogatives under the contract, but a change in working conditions subject to collective bargaining. Dow's personnel manager indicated that while he was willing to discuss implementation of the change he did not consider the change itself to be a matter for negotiation. The Union thereupon filed a grievance.

The contract contains a five–step grievance procedure. It also provides that if the grievance is unresolved after the final step it "may be submitted to any arbitrator or a board of arbitration provided the bargaining committees representing the Union and the Company each furnish written consent to utilize arbitration."[4] Grievance procedures are mandatory, while arbitration requires mutual written consent. Grievance settlements may be retroactive.[5] The contract also provides:

7.7 Strikes and Lock–Outs.

The Union will not cause or engage in or authorize its members to engage in any strike against the Company, nor will any members of the Union take part in any other strike or stoppage or curtailment of work or restriction of production or interference with production of the Company, unless and until all of the Bargaining and Grievance Procedures outlined in this agreement have been exhausted. The Company will not cause or sanction any lock–outs unless and until all of the Bargaining and Grievance Procedures as outlined in this Agreement have been exhausted.

■ The Bargaining and Grievance Procedure in this Article has not been exhausted until all items, a, b, and c, have been carried out as set forth below:

(a) The Grievance Procedure has been used and completed as set forth in Section 7.1.

(b) The Grievance Procedure has been processed through the last Step in Section 7.1 and the Union or the Company has requested in writing, within 30 days to proceed to arbitration as per Section 7.2.

(c) The Arbitration Procedure in Section 7.2 has been completed or the Union has been denied the right to the use of arbitration.

The plain meaning of this clause is that the union undertook a no–strike obligation lasting until at least thirty days after the completion of the fifth and final grievance step.

It is undisputed that the parties completed the first four steps of the grievance procedures; the Step 4 meeting took place on June 3, 1971 but failed to resolve the grievance. At that meeting a union representative orally suggested immediate arbitration, and the company responded by urging the Union to pursue the contract grievance machinery. The contract provides that if a satisfactory solution is not arrived at in Step 4 the Company shall, on written request by the Union, arrange for the unresolved case to be reviewed within ten days by the Midland Division Manager in charge of the plant. The change to five day operation was scheduled to go into effect on Monday, June 7, 1971. On Friday, June 4, there was a conversation between a representative of the Union and Dow's industrial relations manager, but no oral or written request for a Step 5 meeting was made. Indeed, no request for a Step 5 grievance meeting was made by the Union either within the ten days permitted by the contract or at any time thereafter. The day the schedule change was to be put into effect, Monday, June 7, 1971, the production workers at the plant struck.

4. The arbitration clause is quoted in full in our prior opinion. 530 F.2d at 269.

5. The contract provides:
7.5 Retroactivity of Settlements.
The settlement of any grievance or complaint involving an undisputed error in pay shall be retroactive to the date the error occurred but not prior to the date of this agreement. Retroactivity of other grievances shall be the dates agreed to by the Grievance Committees of the Union and the Company. However, in no case shall such retroactive date be earlier than the date of the first written report to a representative of the Company or later than the date of the written report to the Superintendent of the department.

Dow's plant manager immediately advised the Union that it considered the strike a violation of the contract, and threatened legal action. The next day he advised the Union officials that a failure to promote and advise the return of the employees subjected the officials to disciplinary action including discharge. On June 11, he wrote to the employees, advising them that Dow considered the strike to be illegal. He continued:

In fact, the very dispute that the strike is over is part way through the grievance procedure. I think from an employee point of view that the grievance procedure and arbitration clause that we have at Allyn's Point is a good one. It allows the use of arbitration and determination as to which of the parties is right by an arbitrator with no affiliation with the Company or Union.

I sincerely feel that the resolution to the problem lies in the grievance and arbitration procedure and ask you to encourage your Union leadership to return to the legal and in my opinion morally right means of solving this problem.[6]

The letter also indicated that the strike could result in "legal remedies, disciplinary action, and even discharge."[7] When this letter was sent on June 11, 1971, a Union request for a Step 5 grievance would still have been timely. The strike continued. Dow sought in the Superior Court of Connecticut, and on June 29, 1971 obtained, a temporary injunction against unlawful picketing. On July 23, after having written two additional letters advising the employees that it considered the strike illegal, Dow advised them that it would begin hiring replacements on July 29. Meanwhile it requested the assistance of the Connecticut state mediation service, and, on July 26, 1971, advised the State Labor Commissioner that it was willing to submit the labor dispute resulting in the strike to arbitration or mediation. The Union was made aware of Dow's willingness to arbitrate or mediate when, on August 12, 1971, Dow amended its state court complaint to allege:

On July 26, the Plaintiff notified the Labor Commissioner of the State of Connecticut in writing of its willingness to submit the labor dispute resulting in said strike or walkout to arbitration or mediation.

Despite notice of Dow's willingness to arbitrate even after expiration of the time limits specified in the contract, the Union continued the strike. On August 9, 1971, Dow notified the Union that because of the breach of the Collective Bargaining Agreement the contract was cancelled. Shortly thereafter the company terminated the employment of the striking employees. Dow also filed a complaint in the United States District Court, on August 20, 1971, charging the Union with breach of contract and seeking money damages. When a majority of the new or returned employees petitioned Dow, contending that they no longer wished to be represented by the local affiliated with the Union, the company, on August 28, 1971, informed the Union that its bargaining representative status would no longer be recognized.

While the strike continued, the Union filed in June of 1971 the first of a series of unfair labor practice charges, on which complaints were issued, all of which were consolidated for hearing before an administrative law judge. At that hearing the positions of the Union as the charging party and that of the General Counsel diverged. The Union's position was, and has remained, that by unilaterally announcing and implementing a change in the operating schedule, the company not only breached the collective bargaining agreement, but also committed the unfair labor practice of refusing to bargain with the designated representative of the employees, in violation of section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1), (5). The Union contends that the strike was from the outset an unfair labor practice strike, which was not a violation of the contract. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct.

---

**6.** Exhibit M, 397a.

**7.** *Id.*

349, 100 L.Ed. 309 (1956). This being so, the Union argues, all the strike activity was legal protected activity. Thus the company's termination of striking employees, cancellation of the contract, and withdrawal of recognition were in retaliation against protected activity, and in violation of section 8(a)(1), (3), and (5) of the Act. The General Counsel, on the other hand, did not contend that the initial strike was an unfair labor practice strike falling outside the coverage of the no–strike agreement. He contended that the company's action in announcing the unilateral change was both a breach of contract and a refusal to bargain in violation of section 8(a)(5), but that the strike nevertheless violated the contract. Focusing on the company's later actions in response to the strike, the General Counsel contended that the termination of striking employees, the rescission of the contract, and the withdrawal of recognition were separate unfair labor practices which converted an economic strike in breach of the collective bargaining agreement into an unfair labor practice strike.

The Board, adopting the decision and recommended order of the Administrative Law Judge, dismissed the charges. It held:

(1) that the unilateral announcement and implementation of a work schedule change was a refusal to bargain and an unfair labor practice as to which no remedy was warranted in the circumstances of the case;

(2) that the strike was a breach of the collective bargaining agreement because the unfair labor practice and the company's breach of contract which precipitated it was not so serious as to take it outside the covenant not to strike; and

(3) that since the strike was illegal the company's reactions to unprotected activity were not unfair labor practices.

Member Fanning dissented solely on the ground that the Board's interpretation in *Arlan's Department Store of Michigan, Inc.*, 133 N.L.R.B. No. 56 (1961) of the Supreme Court's *Mastro Plastics* decision was in error. He would have held that any employer unfair labor practice falls outside the coverage of a no–strike covenant. Thus no member of the Board adopted the General Counsel's position that what started out as an illegal economic strike was converted into an unfair labor practice strike by Dow's subsequent actions.

When the Union, as charging party, petitioned for review to this court it continued to espouse the theory that its strike was legal from the outset. The General Counsel, this time wearing the hat of counsel for the Board rather than of prosecutor of unfair labor practices, urged that the order dismissing the charges in their entirety be enforced. This court, acting more or less sua sponte, requested an expression of the Board's views on the question whether, assuming the strike was in fact a breach of contract, there wasn't something to be said for the General Counsel's original position that the subsequent company actions might nevertheless have independent significance as unfair labor practices. In essence we were asking whether, in the opinion of the Board, the law of labor injunctions as evolved from *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957) through *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) to *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), did not suggest a reconsideration of the rule of *Marathon Electric Mfg. Co.*, 106 N.L.R.B. 1171 (1953), *enforced sub nom. United Electrical Radio & Machine Workers v. NLRB*, 223 F.2d 338 (D.C.Cir.1955), *cert. denied*, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956). The *Marathon Electric* rule is that the unilateral cancellation of a collective bargaining agreement following a breach of an applicable no–strike agreement, is not an employer unfair labor practice. Although we spoke of the *Mastro Plastics/Arlan's* formulation with perhaps less precision than we might have, 530 F.2d at 280, it is clear that we were proceeding on the assumption that the strike was a material breach of contract, and that our primary interest in remanding was to determine

whether, assuming such a breach, *subsequent* company actions could be considered unlawful retaliations against protected activities. Had we felt that the strike was, as the Union urged, a legal one not even covered by the no–strike clause of the collective bargaining agreement, our opinion obviously would have been written quite differently, for in that event the conclusion that all the subsequent company actions complained of were illegal retaliations for protected activity would have been inescapable.

## II.

### Proceedings On Remand

When the Board reconsidered the case following our remand it was decided upon entirely different grounds. Chairman Fanning, with members Jenkins, Murphy, and Truesdale, held that Dow's unilateral announcement and implementation of the work schedule change was a serious unfair labor practice undermining the status of the Union, to which the no–strike clause did not apply. Thus all of the Union's activity after June 7, 1971 was considered a protected unfair labor practice strike, and all of the company's responsive actions retaliations for engaging in protected activity. The Board, therefore, eight years after the events in issue, ordered reinstatement of the discharged strikers and recognition of the Union as the exclusive bargaining representative for the plant employees. Member Penello dissented, and member Truesdale wrote separately. From the separate opinions three positions emerge. Chairman Fanning and member Jenkins, relying on *Mastro Plastics*, would hold that whenever an employer committed an unfair labor practice, even one which depended, as here, on an interpretation of the contract, and even one for which there was an unexhausted contractual remedy, the no–strike clause should not apply, and strike action is lawful. Members Murphy, Penello, and Truesdale agree that *Mastro Plastics* does not require that result, and adhere to the *Arlan's* rule that only certain serious unfair labor practices, going to the very representative sta-

tus of the collective bargaining representative, should be held to fall outside a no–strike clause. Member Penello would hold that the employer's conduct was not serious and in derogation of the Union's representative status, while the other four members concluded, contrary to the Board's unanimous holding in 1974, that it was. Thus the Board had no occasion to address the issue which was our chief concern in remanding—whether, assuming the strike was in breach of the contract, the company's reactions to it had independent significance as unfair labor practices. In the present posture of the case the chief issue before us is whether the Board erred in concluding that *Mastro Plastics* warrants the result which the Board reached.

## III.

### The Mastro Plastics Rule

There is a degree of confusion evident in the briefs, and in the several Board opinions on remand, engendered perhaps by our earlier opinion, over just what the *Mastro Plastics* rule is. Is it a rule of contract interpretation, looking to the actual intention of the draftsmen of the no–strike clause, or a substantive rule of the law of unfair labor practices? If it is the former, the courts owe no particular deference to the Board, for by virtue of section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, they, or designated arbitral tribunals, are primarily responsible for contract interpretation. If it is the latter, the Board's view is entitled to the usual regard given to the expertise of specialized administrative agencies. Had we made clear in our prior opinion our view as to what *Mastro Plastics* stands for, the Board's response to our remand would have been facilitated. We turn to that task.

*Mastro Plastics* was before the Supreme Court on a petition by an employer to review a Board order growing out of efforts by an employer to influence the outcome of a contested representation dispute between rival unions. A supporter of the unions with which the employer had a collective

bargaining agreement was discharged for refusing to transfer his allegiance to a different union favored by the employer, and a strike ensued. The employer adamantly refused to reinstate the discharged employee and continued its unlawful support for the rival union and the strike continued for several months. The contract contained an arbitration provision to which the union could have referred the discharge grievance, but which probably did not cover the unlawful support issue. It also contained a broad no–strike undertaking.[8] When the union with which the employer had a contract filed unfair labor practices charges, including among others the discharge of 76 strikers, the company defended the discharges before the Board on two theories. It urged that the strike violated the contract, and that the strike was an unfair labor practice in violation of section 8(d)(4) of the Act.[9] The Board held that the no–strike clause was inapplicable to a strike over unlawful assistance to a rival union, and that the strike was not proscribed as an unfair labor practice by section 8(d)(4). The Supreme Court agreed unanimously with the Board's interpretation of the contract. The Court also upheld the Board's interpretation of section 8(d)(4), over three dissents. *See* 350 U.S. at 289, 76 S.Ct. at 361.

The contract issue in *Mastro Plastics* is our concern, since Dow did not urge before the Board that the strike was a section 8(d)(4) violation. That part of the Court's opinion dealing with the contract issue establishes the parameters of our decisional responsibility. The Court wrote:

> Petitioners argue that the words "any strike" leave no room for interpretation and necessarily include all strikes, even those against unlawful practices destructive of the foundation on which collective

bargaining must rest. We disagree. We believe that the contract, taken as a whole, deals solely with the economic relationship between the employers and their employees. It is a typical collective–bargaining contract dealing with terms of employment and the normal operations of the plant. It is for one year and assumes the existence of a lawfully designated bargaining representative. Its strike and lockout clauses are natural adjuncts of an operating policy aimed at avoiding interruptions of production prompted by efforts to change existing economic relationships. The main function of arbitration under the contract is to provide a mechanism for avoiding similar stoppages due to disputes over the meaning and application of the various contractual provisions.

> To adopt petitioners' all–inclusive interpretation of the clause is quite a different matter. That interpretation would eliminate, for the whole year, the employees' right to strike, even if petitioners, by coercion, ousted the employees' lawful bargaining representative and, by threats of discharge, caused the employees to sign membership cards in a new union. Whatever may be said of the legality of such a waiver when explicitly stated, there is no adequate basis for implying its existence without a more compelling expression of it than appears in § 5 of this contract.

350 U.S. at 281–83, 76 S.Ct. at 357–58 (footnote omitted).

It is plain that the Court's holding determined nothing more than the intention of the parties to a particular agreement. *Mastro Plastics* can be read for the proposition that, as a rule of contract interpretation, a general no–strike clause will not be read to

---

**8.** The contract provided:

    The Union agrees that during the term of this agreement, there shall be no interference of any kind with the operations of the Employers, or any interruption or slackening of production of work by any of its members. The Union further agrees to refrain from engaging in any work stoppage during the term of this agreement.

350 U.S. at 281, 76 S.Ct. at 357.

**9.** *See* 29 U.S.C. § 158(d)(4). Section 8(d)(4) makes it an unfair labor practice to resort to a strike or lockout to affect a change in a collective bargaining contract during its term without first giving sixty days notice.

cover strikes in resistance to unfair labor practices aimed at supplanting the bargaining representative chosen by the employees. As the Court elsewhere explained:

[The] clause expresses concern for the continued operation of the plant and has a natural application to strikes and work stoppages *involving the subject matter of the contract.*

*Id.* at 281, 76 S.Ct. at 357 (emphasis added).

■ The *Mastro Plastics* Court speculated about the legality of a waiver of the right to strike over an attempted ouster of a chosen bargaining representative, but it did not suggest that a union could lawfully bargain away the employees' right to freely choose their bargaining representative. An agreement curtailing the employees' free choice would be illegal, and a clause deferring the question of its existence to an arbitral forum would be equally so. No arbitrator could ratify, as an interpretation of the contract, the *Mastro Plastics* employer's effort to choose the employees' bargaining representative. Thus the Court's interpretation that the no–strike clause was coterminous with what could lawfully be agreed to by contract makes perfectly good sense as a presumption of party intention.

■ Our case, however, because of the nature of the unfair labor practice alleged, presents a problem quite different from that with which *Mastro Plastics* dealt. A contract could lawfully relegate solely to management prerogative the disputed matter of a shift change from a seven to a five day work week, and if the Dow contract did so there would have been no section 8(a)(5) refusal to bargain. Thus we are dealing with that unique category of unfair labor practice the very existence of which depends upon competing interpretations of a contract, either one of which would be valid. We are well aware of the frequency with which disputes arise over management

prerogative clauses, and thus over potential section 8(a)(5) violations for refusals to bargain. Unlike disputes concerning employer interference with employee choice of bargaining representative, such disputes can lawfully be and frequently are resolved, finally, by arbitration.[10]

In *Arlan's Department Store* the Board refined *Mastro Plastics*. The walkout in *Arlan's* was, like that in *Mastro Plastics*, precipitated by a discharge of a single employee for engaging in protected activity, and the discharge was both grievable and arbitrable. The Board majority declined to defer to arbitration, holding that the discharge of the single employee was an unfair labor practice and ordering reinstatement.[11] But it declined to find that the consequent strike fell outside the scope of the broad no–strike agreement, and thus held that the discharge of 39 striking employees was not an unfair labor practice. Member Fanning dissented from the latter holding contending, as he has ever since that under *Mastro Plastics* no unfair labor practice strike is subject to a general no–strike agreement:

In my opinion, the clear import of this section of the [*Mastro Plastics*] opinion is that a general no–strike clause in a collective–bargaining agreement for the term of the agreement bars only the right to strike over the "subject matter of the contract" which "deals solely with the economic relationship between the employers and their employees," a so–called "economic" strike, and does not bar a strike to protest unfair labor practices in the absence of an express waiver to that effect *because such a strike is outside the scope of the contract.*

133 N.L.R.B. at 813 (emphasis in original) (footnote omitted). This position is consistent with that taken by members Fanning and Jenkins on Board deferral to contract remedies,[12] a position having the merit of

10. That same problem has spawned the Board's *Spielberg–Collyer* rule. *See NLRB v. Pincus Bros., Inc.–Maxwell*, 620 F.2d 367, 384 (3d Cir. 1980), (Gibbons, J., dissenting), and cases there discussed.

11. That sensible result may be inconsistent with *NLRB v. Pincus Bros., Inc.–Maxwell*, 620 F.2d 367 (3d Cir. 1980).

12. *See General American Transportation Corp.*, 228 N.L.R.B. 808, 809 (1977).

preserving the Board's authority to vindicate statutory as distinguished from contract rights. However, where the issue is not Board power to disregard a contract remedy and grant relief against unfair labor practices, but the intention of the parties in a no–strike clause, the case for the Fanning–Jenkins canon of construction is considerably weaker. Where the unfair labor practice depends, as in this case, entirely on how the contract is interpreted, and involves a dispute over an economic issue–overtime pay–acceptance of the Fanning–Jenkins canon of construction flies in the face of any rational intention likely to have been entertained by those who negotiated the clause. It is one thing to urge, as I have urged in the *Pincus Bros.* dissent, that contract and Board remedies coexist. It is quite another to say that a no–strike clause is presumptively inapplicable in every case in which the Board may have unfair labor practice jurisdiction.

■ Thus we reject the extreme application of the *Mastro Plastics* rule of construction as to the coverage of a general no–strike clause urged by Chairman Fanning and member Jenkins. We turn to the position on which the Board order rests, that in this case the *Arlan's* gloss on *Mastro Plastics* governs. As noted above, *Arlan's* involved a strike precipitated by a discharge for engaging in protected activity, the right to participate in such protected activity being a statutory right which may not be bargained away. The strike in the case before us, however, was over conflicting interpretations of a contract, either of which would be valid if agreed to. In 1971 there were two avenues open to the Union for the resolution of that dispute. It could have pursued contract grievance remedies and asked for arbitration, and it could, if it felt the employer's construction was so totally unreasonable as to amount to a refusal to bargain over a plainly bargainable issue, have filed, as it did, a section 8(a)(5) unfair labor practice charge.[13] Neither course would in any way have undermined its status as exclusive bargaining representative,

for each course could result in retroactive economic relief. It is simply unrealistic to suggest that the no–strike clause quoted at page 1355 *supra* was not intended to apply to a dispute over the meaning of the contract. The Board's revised order, based on a finding that the strike was not a breach of the contract, can not be sustained as an application of the rule of contract interpretation as to the coverage of a no–strike provision announced in *Mastro Plastics*. Whatever may be said about applications of that rule to strikes over unfair labor practices which are, as in *Arlan's*, independent of contract disputes, it simply does not apply here.

## IV.

### *Other Approaches*

The question remains whether aside from the *Mastro Plastics* rule of contract interpretation some substantive rule of labor law supports the Board's result. One tack would be to say that bargaining away the right to strike over any unfair labor practice results in a substantively illegal contract provision; that any unfair labor practice strike must as a matter of law remain protected activity. There are, however, insurmountable barriers to the announcement of such a rule in this case. Whatever may be said for such a rule when applied to unfair labor practices such as interference in the choice of a bargaining representative as in *Mastro Plastics*, its application to section 8(a)(5) unfair labor practices the existence of which depends upon a disputed contract interpretation would have disastrous consequences for arbitration as a preferred means for eliminating industrial strife. Obviously each resort to the courts for a *Boys Markets* injunction pending arbitration of such contract interpretations would be resisted by the contention that the employer's unreasonable construction was a refusal to bargain, an unfair labor practice, and outside the scope of the no–strike undertaking. Resolution of that contention would involve the court in decision of the

---

**13.** *But see Pincus Bros., Inc.–Maxwell, supra,* note 11.

very issue for which the parties selected an arbitral forum.

Another approach would be, as we tentatively suggested in our first opinion, to overrule *Marathon Electric Mfg. Co.,* 106 N.L.R.B. 1171 (1953), *enforced sub nom. United Electrical Radio & Machine Workers v. NLRB,* 223 F.2d 338 (D.C.Cir.1955), *cert. denied,* 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956). *Marathon Electric,* as affirmed by the District of Columbia Circuit, held that a material breach of contract by a union warranted an employer's unilateral cancellation of the entire agreement. Two aspects of that approach must be considered. The first is whether the discharge of strikers was proper. The second is whether the cancellation of the contract was proper. With respect to the first aspect, prohibiting the employer from discharging the strikers raises extreme practical consequences. As we noted in our first opinion, no *Boys Markets* remedy was available to the employer here because the arbitration provision was not coextensive with the no–strike clause. 530 F.2d at 277. Dow did seek state court injunctive relief against unlawful picketing. It then resorted to the only weapon immediately available to it, operating the plant with new employees. A rule protecting illegally striking employees' employment status would effectively prevent the employer's resort to new hires. Moreover, the Supreme Court in *Mastro Plastics* expressly acknowledged that union members violating applicable no–strike clauses lost their status as employees. 350 U.S. at 280, 283, 76 S.Ct. at 356, 358. With respect to the second aspect, the termination of the contract, the same considerations intrude. Where, as here, *Boys Markets* relief is unavailable, the remaining employer option of operating the plant with permanent new hires would be seriously undermined if the employer were unable to bargain collectively with those new employees. Thus the *Marathon Electric* doctrine of material breach of labor contracts continues to fill an important need in the law of labor contracts.

A third approach, which we had in mind at the time of our initial decision, might have made injunctive relief available to employers situated as was Dow a realistic alternative to operating a plant with new hires. We suggested that the evolution of the law under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, would be in the direction of broader availability of injunctive relief for the enforcement of no–strike clauses. The Court's decision in *Gateway Coal Co. v. UMW,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), seemed to offer the promise of such an evolution. Since our initial decision, however, the Court in *Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), overruling our decisions in *NAPA Pittsburgh, Inc. v. Automatic Chauffeurs,* 502 F.2d 321 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974), and *Island Creek Coal Co. v. UMW,* 507 F.2d 650 (3d Cir.), *cert. denied,* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975), has effectively eliminated that possibility in cases such as this where the no–strike clause and the arbitration clause are not coextensive.

█ Finally there remains the question on which we sought, and did not receive, enlightenment from the Board; whether independent of the Union's material breach of contract some of Dow's post-strike activities were unfair labor practices. The Union urges that we should once more remand, forcing the Board to give us its views. We conclude for several reasons that another remand would be inappropriate. First, we have undertaken a careful review of the record, and we conclude that the discharge of strikers and the termination of the contract could not be found to be unfair labor practices. The strike was a material breach of contract, no *Boys Markets* injunction was available, and, unless the employer were to submit to ongoing economic coercion, new hires to operate the plant were a necessity. Permanent replacement of economic strikers and termination of the contract are corollaries to that necessity. The termination of the Union's bargaining relationship is a closer question, since it more directly relates to the non–

contract issue of interference with choice of a bargaining representative. But there is evidence in the record of loss of majority status among the new hires, and our conclusion that termination of the strikers was not an unfair labor practice precludes reinstatement of the former Union adherents. Thus Union adherents were not in the majority. Perhaps most important of all, there has been the passage of nine years since the events in issue transpired. A remand solely for consideration of a bargaining order at this late stage in the history of the Allyn's Point plant would not advance the cause of free choice in the selection of a bargaining representative.

## V.

## CONCLUSION

Two members of this panel were members of the panel which considered the case when it was first before us. With the benefit of hindsight we offer our mea culpa to the Board for a remand in a case which on considered reflection does not seem to have been an ideal vehicle for the exploration of all the issues in the interrelationship between the law of unfair labor practices and that of contract remedies which we posed. Dow's petition for review will be granted, the Board's petition for enforcement denied, and the Board's order set aside.

WEIS, Circuit Judge, dissenting.

In our previous opinion in this case, we emphasized the importance of resolving industrial disputes peacefully, and pointed to the favorable climate generated by *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), *Gateway Coal Co. v. UMW*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), and this court's decisional law following that trend, *e. g., Island Creek Coal Co. v. UMW*, 507 F.2d 650 (3d Cir.), *cert. denied*, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975); *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs Local 926*, 502 F.2d 321 (3d Cir.) (in banc), *cert. denied*, 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974). Since that

time, however, *Buffalo Forge Co. v. Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), has narrowed the legal remedies available to federal courts in labor–management disputes.

Nevertheless, it seems to me that the point we made in *Dow I*, 530 F.2d 266 (3d Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976), is still valid and represents an enlightened view on the resolution of these disputes. Our position was simply that stability in industrial relations is enhanced by the continuance of a collective bargaining agreement, and therefore, its unnecessary termination should be discouraged. Thus, we thought that even though the strike was illegal, the Board should consider whether termination of the contract was justified when the company had not exhausted the available grievance procedures or its options to proceed in court. Despite our opinion, the Board did not explore the ramifications of our suggestion and, instead, on remand decided the case on a different, and, as the majority explains, erroneous basis.

The reluctance of the Board to seriously consider our more civilized approach to settling labor–management differences is regrettable. It is disturbing that given the opportunity, the Board failed to take a stand against the unnecessary "tooth and claw" industrial warfare which we decried.

*Dow I*'s philosophy is that both labor and management should be required to exhaust every possible peaceful method through grievance proceedings arbitration, administrative action, and court proceedings before being permitted to resort to self–help which necessarily inconveniences the public at large. Because the Board did not measure the parties' actions by that standard, I would remand once again.