**CATERPILLAR TRACTOR CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Local 806, Allied Industrial Workers of America, AFL–CIO (Union), Party-Respondent.**

No. 80–2036.

United States Court of Appeals, Seventh Circuit.

Argued April 27, 1981.

Decided Sept. 10, 1981.

Rehearing and Rehearing In Banc Denied Oct. 7, 1981.

C. R. Gangemi, Jr., Winston & Strawn, Chicago, Ill., for petitioner.

Kenneth R. Loebel, Milwaukee, Wis., Larry Blatnik, Deputy Assoc. Gen. Counsel N.L.R.B., Washington, D. C., for respondent.

Before SPRECHER and WOOD, Circuit Judges, and CAMPBELL,* Senior District Judge.

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

WILLIAM J. CAMPBELL, Senior District Judge.

The Petitioner, Caterpillar Tractor Co., (hereafter the Company), petitions for review of a National Labor Relations Board Order finding that it engaged in an unfair labor practice and that the subsequent strike by the employees was not prohibited by the no-strike clause of the Collective Bargaining Agreement. The Board cross-applies for enforcement of its Order.

Petitioner operates a factory for the production of heavy machinery in Milwaukee, Wisconsin which employs approximately 650 persons. The intervenor union has been the recognized representative for the employees for over 20 years. The Collective Bargaining Agreement provides for a transfer request system whereby employees may seek transfer to another job classification. While the contract only granted the employees the right to obtain promotions through the system, it was also used frequently by the employees to obtain voluntary demotions.[1]

In February 1978, the petitioner was confronted with record high production schedules and, as a result of numerous voluntary demotions pursuant to the transfer request system, it was experiencing difficulties in maintaining a sufficient number of highly skilled personnel. Therefore, the company decided that as a policy it would no longer allow voluntary demotions.

On April 27, 1978, the Employees Relations Manager, Kyle Spitzer, met with the chairman of the union bargaining committee, Dennis Rimert, and stated that the Company intended to hire a janitor from the street. He stated that as a policy the Company would no longer permit voluntary demotions. Rimert indicated that the union would be upset and suggested that a previous arbitration award prohibited this action.

On May 9, 1978, Spitzer met with the entire union bargaining committee. He again explained the situation and the nature of the policy change. He stated that this was not a permanent policy but that it was necessary in light of the current circumstances. He suggested that special factors such as family circumstances and health considerations might be sufficient to create exceptions to the new policy. The union again expressed dissatisfaction with the Company's action.

The Company proceeded on May 15, 1978 to hire an off-street person to fill the janitor position. At that time there were 19 transfer requests on file for this job classification. The union responded the next day by filing a grievance on behalf of union member, Steve Tomkiewicz. The grievance contended that the company violated Article 8, Section 8.2, or "any other section of the contract which may apply" by not recognizing the employees' right to downgrade themselves through the transfer request system.

On May 21, 1978, a special union meeting was held to discuss six different issues, including the company's change in policy regarding voluntary demotions. Rimert chaired the meeting and after informing the membership of the company's change in policy the membership became boisterous and called for a strike. The union leaders advised against a strike, suggesting that it would be a violation of the Collective Bargaining Agreement, and said the matter was being pursued through the Tomkiewicz grievance. Nevertheless, at approximately eleven o'clock that night the employees went on strike. Approximately 500 to 600 employees picketed in front of the plant. When the union representatives tried to persuade them to return to work, they were shouted down. The next day a membership meeting was held and by eleven o'clock that night the employees returned to work.

On May 23 and 24, four management representatives met with the entire union

---

1. The employees sought these demotions for various reasons: (1) to obtain relief from the high pressure incentive work; (2) to obtain less demanding positions, thereby extending their careers for purposes of pension benefits; (3) to obtain a lower-graded job with different career promotion progression which could ultimately bring positions higher than those originally held; or (4) to obtain lower-graded positions which carried more overtime potential.

bargaining committee. They indicated that the company would not alter its decision and if the union did not like it, it should grieve the matter. Spitzer gave the following reasons for the decision:

(1) The increased production schedule;

(2) The expense of replacing experienced personnel with newly-hired employees who required training;

(3) The chain reaction caused by voluntary demotions which created vacancies requiring promotions; and

(4) The Federal Government's affirmative action policy, which required the company to create employment opportunities for minority personnel which were usually in the lesser-skilled classifications.

He also suggested that the union give the company a list of those employees it believed should be considered as exceptions to the policy.

On May 26, 1978 the petitioner discharged three employees who engaged in the strike and suspended four others for various periods. Two of those discharged, Steven Tomkiewicz and Paul Wellna, were union officials. The company utilized four criteria in reaching the decision to discipline the employees. The four criteria were: (1) front line activity during the strike; (2) active confrontation involving either impeding entry to the plant or other words or actions against management during the strike; (3) presence on the scene during most of the strike; (4) union officers with incumbent responsibilities to avert or discourage wildcat activities.

The Tomkiewicz grievance was pursued through the third step level of the grievance procedure by the middle of June, at which time the company requested arbitration. The union stated it would oppose arbitration at this time because it had already filed its petition before the NLRB.

The Administrative Law Judge made the following findings and conclusions:

(1) That deferral to arbitration was not appropriate because resolution of the dispute required interpretation of the Labor Relations Act;

(2) The Collective Bargaining Agreement did not provide the employees with the right to voluntarily downgrade themselves. However, by April 27, 1978, when the company announced the change in policy, the practice had evolved by custom and usage into a term and condition of employment;

(3) The company's unilateral restriction of voluntary downgrading was not unlawfully motivated within the meaning of 29 U.S.C. §§ 158(a)(1) and (3). However, the company did not fulfill its obligation to bargain in the matter, thereby violating Sections 158(a)(1) and (5); and

(4) The employee's strike was caused by the company's unlawful conduct and was therefore an unfair labor practice strike. The conduct of the company was deemed to go to the essence of the bargaining relationship and therefore the strike was protected activity under *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). Therefore, the disciplinary action of the company in discharging and suspending certain striking employees was an unfair labor practice in violation of Sections 158(a)(1) and (3). A three-member panel of the NLRB affirmed the findings and conclusions of the ALJ.

■ The petitioner argues that the Board should have refrained from exercising jurisdiction and deferred to the grievance-arbitration procedure outlined in the collective bargaining agreement. Our standard of review on this matter is simply whether the Board abused its discretion by not deferring, *N.L.R.B. v. Wisconsin Aluminum Foundry Co.*, 440 F.2d 393 (7th Cir., 1971). The company contends that the dispute was merely a question of contractual interpretation, and that in such situations the congressional labor policy favors utilization of the contractual means of resolution. However, the Board determined that the issue of the employees' right to downgrade themselves was not covered by the contract, but rather required a *de facto* analysis and an interpretation of the National Labor Relations Act (hereafter the Act).

■ The Board's policy is that it will not defer to grievance or arbitration procedures when the determinative issue requires an interpretation of the Act, see *Newspaper Guild Local 10 v. NLRB*, 636 F.2d 550, 559 (D.C.1980); *NLRB v. Northeast Oklahoma City Mfg. Co.*, 631 F.2d 669, 674 (10th Cir., 1980). We find nothing unreasonable about the application of this policy in this case, and therefore cannot conclude that the Board abused its discretion.

The company contends that the Board erred in concluding that it had committed an unfair labor practice by unilaterally altering its policy as to voluntary downgrading by the employees. Petitioner does not dispute the finding that voluntary downgrading had evolved by custom and usage into a term and condition of employment, but contends that it satisfied its duty to bargain with the union on the issue. It notes that it gave the union almost three weeks notice of its intended action and met with union representatives numerous times. Additionally, the company argues that the grievance-arbitration procedure outlined in the contract was the proper means for bargaining on this matter and that it willingly participated in that process.

■ The latter argument can be dealt with summarily. As stated in *Alfred M. Lewis, Inc. v. NLRB*, 587 F.2d 403 (9th Cir., 1978):

"... arbitration concerning the propriety or fairness of the company's policy after it had been put into effect was not a substitute for bargaining between the Company and the Union as to whether the policy should be adopted in the first instance.

An essential aspect of the Union's role in collective bargaining is its right to be consulted by the employer about mandatory subjects of bargaining and to make comments, objections, or suggestions to the employer before action is taken. This is a practical mechanism to insure the stability of industrial relations. The Board correctly held that the employer disregarded it here. It would wholly undercut the duty to bargain if the employer were allowed to act with reference to a mandatory bargaining subject and then simply defend its actions in a later arbitration hearing."

The company's other argument requires a more detailed analysis. We begin with a definition of the obligation imposed by § 158(a)(1) and (5):

"Good faith compliance with Sections 8(a)(5) and (1) of the Act presupposes that an employer will not alter existing 'conditions of employment' without first consulting the exclusive bargaining representative selected by his employees, and granting it an opportunity to negotiate on any proposed changes."

*NLRB v. Proof Co.*, 242 F.2d 560, 562 (7th Cir., 1957), *cert. den.*, 355 U.S. 831, 78 S.Ct. 45, 2 L.Ed.2d 43 (1975), quoting *Armstrong Cork Co. v. NLRB*, 211 F.2d 843, 947 (5th Cir., 1954). The company contends that the meetings of April 27, May 9, 21, 22, 23 and 24 satisfied this obligation.

However, at the initial meeting, Spitzer told Rimert that the company had changed its policy and was going to hire a janitor from the street. The ALJ's findings indicate that at the other meetings the company did little more than explain the reasons for the change in policy and suggest that if the union did not like the change it should file a grievance.

The only indication given by the company that there was grounds for negotiation was Spitzer's statement on May 9 that exceptions would be permitted when the downgrading was sought for family or health reasons. However, as noted by the ALJ, no effort was made by the company to determine whether any of the nineteen applicants for the position of janitor satisfied either of those criteria even though that information appeared on the face of the transfer request form. Moreover, it was not until after the company hired a janitor that it requested the union to designate which employees should be considered as exceptions to the new policy.

■ In summary, the ALJ's findings indicate that on April 27 when the company

announced its change in policy it also informed the union that the initial implementation of the policy would be the hiring of a janitor from the street. Although the union strenuously objected, the company proceeded to hire a janitor from the street without providing the union with a meaningful opportunity to negotiate about that action. Therefore, we agree with the Board that the company did not satisfy its obligation under Section 8(a)(5) and (1) of the Act.

The petitioner also contends that the Board erred in concluding that the wildcat strike was protected activity under the *Mastro Plastics* rationale. In *Mastro Plastics,* supra, an employer had actively engaged in supplanting the contractually recognized bargaining representative for its employees. After the company discharged an employee for failing to transfer his allegiance to the union it preferred, the employees went on strike. The company then discharged all the striking employees, and the union filed a petition with the NLRB. The Board determined that the employer had committed unfair labor practices and ordered the employees reinstated. The Board was affirmed by the Court of Appeals, which in turn was affirmed by the Supreme Court.

The Supreme Court held that the collective bargaining agreement did not waive the employee's right to strike under the circumstances of the case, despite the inclusion of a "no-strike, no-lockout" provision.[2] The Court noted that the language of the clause was very broad but declined to accept the employer's construction of it as waiving the right to strike in any situation.

The *Mastro Plastics* case has been interpreted by the NLRB to stand for the proposition that "only strikes in protest against serious unfair labor practices should be held immune from general 'no-strike' clauses," *Arlan's Department Store of Michigan, Inc.,* 133 NLRB 802, 807 (1961). This construction has received approval from the courts,

*NLRB v. Northeast Oklahoma City Mfg. Co.,* 631 F.2d 669, 675 (10th Cir., 1980), *Dow Chemical Co. v. NLRB,* 636 F.2d 1352, 1360 (3rd Cir. 1980). The unfair labor practice is considered "serious" if it is "destructive of the foundation on which collective bargaining must rest," *Mastro Plastics,* 350 U.S. at 281, 76 S.Ct. at 357.

Previously, we concluded that the petitioner in this case engaged in an unfair labor practice. Since no one challenges the ALJ's finding that the strike was caused by the company's change in policy, the strike must be considered an unfair labor practice strike. Under the *Mastro Plastic* rationale, the issue requires an interpretation of the "no strike" clause of the collective bargaining agreement and a determination as to whether the company's unfair labor practice was "serious."

■ Article 2.10 of the collective bargaining agreement provides:

"The company agrees that there will be no 'lockout' of its employees, and the Union agrees that there will be no strike or stoppage of work until all peaceable means, as enumerated in the grievance procedure of this agreement, of reaching a mutually satisfactory decision on any and all problems have been tried. In no event shall employees engage in a slowdown or sitdown."

The ALJ simply referred to this clause as a "no-strike, no-lockout" provision. However, it is more than specific than the clause at issue in *Mastro Plastics,* and we believe that difference is significant in determining the extent to which the employees waived their right to strike. We construe Article 2.10 to mean that the employees waive their right to strike as long as the union and the company are attempting to resolve the underlying dispute through the grievance procedure created by the contract, see *Dow Chemical,* 636 F.2d at 1355. It is undisputed that the Tomkiewicz grievance was filed on May 16 and that it reached the third step of the grievance procedure in the middle of

---

2. The provision provided that:

"The Union agrees that during the term of this agreement, there shall be no interference of any kind with the operations of the Employers, or any interruptions or slackening of production of work by any of its members. The Union further agrees to refrain from engaging in any strike or work stoppage during the term of this agreement."

June. Therefore, it was clearly pending when the wildcat strike occurred on May 21.

Furthermore, we cannot conclude that the company's action was a "serious" unfair labor practice as defined by *Mastro Plastics*.[3] The ALJ specifically found that the company's action was not unlawfully motivated within the meaning of Sections 8(a)(1) and (3) of the Act. The company always met with the union as the bargaining representative and did not attempt to supplant or deceive it. Additionally, the fact that the parties were attempting to resolve the dispute through the grievance procedure outlined in the collective bargaining agreement indicates that their relationship was still intact.

■ The ALJ concluded that the company's action was a "serious" unfair labor practice within the meaning of *Mastro Plastics* because it

> "involved unilateral changes of established terms and conditions of employment in violation of the [company's] duty to bargain with the employees recognized representatives and, accordingly, go[es] to the essence of the bargaining relationship itself."

This position has received support in dicta in *Northeast Oklahoma City Mfg. Co., supra*, 631 F.2d at 677. We cannot agree that all unilateral actions in violation of the duty to bargain should be considered "serious" unfair labor practices for purposes of the *Mastro Plastics* test. Situations may arise, such as in the instant case, where the refusal to bargain is not unlawfully motivated, but is the result of a good faith reliance, albeit erroneous, upon the management prerogative clause. The Court in *Dow Chemical* supra, stated:

> We are well aware of the frequency with which disputes arise over management prerogative clauses, and thus over potential section 8(a)(5) violations for refusals to bargain. Unlike disputes concerning employer interference with employee choice of bargaining representative, such

disputes can lawfully be and frequently are resolved, finally, by arbitration. [footnote omitted] 636 F.2d at 1360.

To create a general rule that all 8(a)(5) violations satisfy the *Mastro Plastics* standard would be to encourage strikes where contractual means of resolution may be available, and would be inconsistent with federal labor policy, *see e. g. Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1956); *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

Additionally, we note that the strike in this case was not called by the union, nor was it ever ratified by it. In fact, the union leaders actively opposed the strike, believing it to be a violation of the collective bargaining agreement. Thus, the action of the employees was "destructive of the foundation on which collective bargaining must rest." As a matter of policy it would be unwise to grant such a strike the status of protected activity.

■ In summary, we conclude that under the collective bargaining agreement, the employees had waived the right to strike when the underlying dispute was being processed through the contractual grievance procedure. Additionally, we do not find that the company's action was a "serious" unfair labor practice within the meaning of *Mastro Plastics*. Therefore, we conclude that the strike was a breach of the collective bargaining agreement and cannot be considered protected activity.

■ Since we conclude that the strike was not protected activity, we must address the issue of whether the discharging of union officials Tomkiewicz and Wellna was a violation of Sections 8(a)(3) and (1) of the Act. While the company considered their union status as a factor in determining the severity of the discipline, it was only one of four criteria utilized. In *Indiana & Michi-*

---

**3.** It is regrettable that the *Mastro Plastics* rule has been phrased as involving "serious" unfair labor practices. We believe all unfair labor practices are serious, and do not attempt to minimize petitioner's violation in making this analysis. However, since all the cases interpreting *Mastro Plastics* have used this terminology, it is difficult to depart from at this time.

*gan Electric Co. v. NLRB*, 599 F.2d 227 (1979) this court upheld the discharging of certain employees who had engaged in an illegal strike, when the sole criterion was their union status. The court stated:

> "We believe the employer was entitled to take into account the union officials' greater responsibility and hence greater fault, and that the resulting different treatment of union officials could not be reasonably considered inherently destructive of important employee rights." 599 F.2d at 232.

We believe that the *Indiana & Michigan Electric Co.* case controls the disposition of the issue in this case. Accordingly, we conclude that the discharging of employees Tomkiewicz and Wellna was not a violation of Sections 8(a)(3) and (1) of the Act.

Accordingly, enforcement is granted insofar as the Board determined that the petitioner violated Sections 8(a)(1) and (5) by failing to fulfill its obligation to bargain with the union. However, enforcement is denied as to the Board's conclusion that the strike was protected activity in that the company violated Sections 8(a)(1) and (3) by discharging employees Tomkiewicz and Wellna.